UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FAÏZA HARBI | * | |
| | * | |
| Plaintiff, | * | |
| | * | **PLAINTIFF CLAIMS** |
| v. | * | **TRIAL BY JURY** |
| | * | |
| MASSACHUSETTS INSTITUTE OF | * | |
| TECHNOLOGY, and WALTER LEWIN | * | |
| | * | |
| Defendants. | * | |

## COMPLAINT

This cause of action arises from Defendants' deliberately indifferent response to a teacher-on-student sexual assault. Defendants' failure to comply with all Title IX requirements and to promptly and appropriately investigate and respond to the assault subjected Plaintiff to a hostile environment, effectively denying her access to educational opportunities. This action alleges violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 as well as claims of negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. Additionally, the Defendant Walter "Lewin" (hereinafter "Lewin") engaged in inappropriate and improper conduct individually and/or as an agent of Massachusetts Institute of Technology (hereinafter "MIT") with the Plaintiff.

## PARTIES AND JURISDICTION

1. The Plaintiff, Faïza Harbi, (hereinafter "Harbi") resides in Montpellier, France.

2. The Defendant "MIT" is a private institution of higher learning that receives federal funding, and is located in Boston, Massachusetts.

3. The Defendant "Lewin" at all times relevant to this lawsuit was a professor at "MIT", with a principal place of business at 139 Cushing Street, Cambridge, Massachusetts 02138.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction) and the doctrines of ancillary and pendent jurisdiction

5.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because "MIT" is located in this judicial district and a substantial part of the events which give rise to the claims herein occurred in this district.

## FACTS COMMON TO ALL CAUSES OF ACTION

6.  In August 2013, "Harbi" enrolled in the EDX 'For The Love Of Physics' course (8.01X) taught by "Lewin" and promulgated and/or sponsored by "MIT". The class began in September, 2013.

7.  "Harbi" decided to take the course due to her love of learning and to also obtain a Certificate of Mastery from Professor "Lewin" due to his association with "MIT" and his perceived reputation.

8.  Many EDX courses have a Facebook page where students can assist each other with assignments. Because 'For The Love of Physics' did not have a page, "Harbi" created one. This was a closed group and students had to apply to join.  "Harbi" and the other administrators could either accept or decline the request as well as ban users from the group.

9.  On November 24, 2013, "Lewin" requested to join the Facebook group. "Harbi" believed this to be a prank, and requested that "Lewin" send her an email to her EDX address which only the professor of the course would have access to.  Shortly thereafter, she received an email with a snapshot of her course progress and accepted "Lewin's" request to join the Facebook group.  "Lewin" commented that she was doing very well.

10. Shortly thereafter, "Harbi" disclosed to "Lewin" that her concentration in class may be affected by her medication, to which "Lewin" inappropriately responded with "what medication do you take and why?"

11. In another email shortly thereafter, "Lewin" asked "what happened that caused your depression, to which "Harbi" responded by detailing her history of being the victim of an abusive upbringing.

12. "Lewin" responded to "Harbi's" detailed description of her past abuses with sexually explicit terminology, which was just the beginning of numerous inappropriate emails and messages between him and "Harbi".

13. Approximately three weeks after this initial contact, "Harbi" received a friend request from "Lewin" on Facebook. "Harbi" and "Lewin" then began communicating by private messenger and eventually began messaging on Skype as well.

14. Upon becoming Facebook friends with "Harbi", "Lewin" explicitly suggested to "Harbi" that becoming friends will help her to regain self confidence and also implied success in his classes suggesting a quid pro quo for success in his class.

15. In early December 2013, the conversations between "Harbi" and "Lewin" turned even more explicit, with "Lewin" disclosing to her that he "wanted her body in a sexual way." "Harbi" explicitly stated to "Lewin" that she does not feel the same way about him.

16. "Lewin" continued to improperly influence and sexually harass "Harbi" online throughout her time as a student in the "MIT" EDX course, again implying that her success with the class could be affected by her relationship with "Lewin".

17. Throughout the subsequent months, "Harbi" did not break contact with "Lewin" for fear of being removed from the EDX course. This fear stemmed in part from her past abuse. In an attempt to end "Lewin's" persistent requests and continue with her education, "Harbi" sent him revealing photographs. At all relevant times "Harbi" believed that "Lewin" was acting as an "MIT" professor and her completed class performance could be recorded on a

professional resume as an "MIT" affiliated course.

18. "Harbi" and "Lewin" also communicated via Skype video sessions during which "Lewin" performed sexually explicit acts including exposing his genitalia and masturbating. Additionally, "Lewin" sent "Harbi" nude photographs on multiple occasions, some of which were sent through his "MIT" email furthering confirming his association with "MIT".

19. "Lewin" used his "MIT" email to send not only explicit images, but highly inappropriate written messages that, at all times relevant, were sent through the "MIT" email server.

20. In August 2014, upon realizing that the online sexual activity instigated by "Lewin" was highly inappropriate, "Harbi" began to self-mutilate and was hospitalized.

21. Prior to these inappropriate contacts with "Lewin", "Harbi" had achieved some semblance of a work and intellectual life with her online course taking, successfully completing a few courses and was feeling better about herself.

22. "Lewin's" online manipulation and sexual harassment seriously and profoundly exacerbated "Harbi's" symptoms.  He improperly used his association with "MIT" and his position to induce "Harbi" to engage in an inappropriate relationship with his student in exchange for her perceived belief that her academic performance was dependent on "Lewin".

23. On October 7, 2014, "Harbi" reported "Lewin's" conduct to "MIT" and also began seeing a survival counselor. During the investigation, "Harbi" provided documents that were reviewed by "MIT", who determined that "Harbi's" complaint warranted a formal review. This was then brought to the attention of other "MIT" officials.

24.  "MIT" conducted an investigation and on December 2, 2014, informed "Harbi" of the

results.

25. "MIT" found that "Lewin's" conduct "violated "MIT's" Policies and Procedures, including Sections 9.5 Policy on Harassment, 4.4 Conflict of Interest, 9.1 Personal Conduct and Responsibilities Towards Students and Employees, and 9.7 Relations with Students and Student Conduct."

26. "MIT" policy defines sexual harassment to include unwanted requests for sexual favors, sexually suggestive conduct, or offensive remarks of a sexual nature.

27. In response to "Harbi's" complaints, "MIT" simply severed ties with "Lewin" and prohibited him from accessing "MIT" resources.  Nothing else was done by "MIT" to assist "Harbi" with the harm "Lewin" and "MIT" had caused her.

28.  In the investigation report, "MIT" did not indicate that it would initiate any type of additional training sessions for their instructors, employees, staff or students to educate them on sexual abuse on campus and in online course work.

29. This was not the first instance of online sexual harassment perpetrated by "Lewin" towards students of his online EDX course.

30. At all times relevant, "MIT" had access to their internal servers, the EDX courses, and professors' email addresses.

31. At all relevant times "MIT" knew or should have known that "Lewin" was engaged in inappropriate conduct with students while utilizing his "MIT" affiliation.

32. At all relevant times "MIT" permitted "Lewin" to use his "MIT" affiliation and email creating an actual and/or apparent agency relationship between "MIT" and "Lewin".

33. On April 4, 2011 the United States Department of Education (hereinafter "DOE") Office for Civil Rights (hereinafter "OCR") issued a letter to all educational institutions

throughout the country to provide further guidance and mandates regarding the increased incidence of sexual assaults occurring throughout the country at college campuses and secondary schools. This letter is commonly referred to as the Dear Colleague Letter (hereinafter "DCL").[1] "OCR" reminded schools that under Title IX of the Education Amendments of 1972 (Title IX), 20 USC § 1681 et seq. and 34 C.F.R. Part 106, discrimination on the basis of sex in education programs or activities operated by recipients of federal financial assistance are prohibited. Moreover, sexual harassment of students, which includes acts of sexual violence, was identified as a form of sex discrimination prohibited by Title IX. In an effort to offer assistance to these various educational institutions in meeting their obligations under federal law, the "DCL" set forth the requirements of Title IX pertaining to sexual harassment which also covers sexual violence and laid out specific Title IX requirements applicable to sexual violence that Emerson was required to follow since 2001.

34. One of the issues identified in the "DCL" related to the reported statistics on sexual violence which were both "deeply troubling and a call to action for the nation". The "DCL" identified a report prepared by the National Institute of Justice that found that one in five women are victims of completed or attempted sexual assaults while in college. The "DCL" describes the schools responsibility to take immediate and effective steps to end sexual harassment and sexual violence. Moreover, the "DCL" also reminded schools that the requirements set out in this letter for the most part had already been in place since "OCR"'s revised sexual-harassment guidance which was issued in 2001 (2001 guidance).[2] The

---

[1] The letter is attached hereto as <u>Exhibit A</u>.

[2] The 2001 Guidance "OCR" regulations are attached as <u>Exhibit B</u>.

"DCL" supplements the 2001 guidance by providing additional guidance and practical examples regarding Title IX requirements as they relate to sexual violence. The "DCL" also provides practical examples regarding Title IX requirements as they relate to sexual violence and identifies the need for educational institutions to take proactive efforts to prevent sexual harassment and violence.

35.   As explained in "OCR"'s 2001 guidance and the "DCL", when students sexually harass another student, such harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits the students ability to participate in or benefit from the schools program. The "DCL" also indicates that the more severe the conduct, the less need there is to show any repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. In fact, the "DCL" identified several Federal Circuit Courts of Appeals that have confirmed that a single isolated incident of sexual harassment may create a hostile environment, if the incident is sufficiently severe and it identifies a single instance of rape as being sufficiently severe to create a hostile environment. According to "OCR", if the school knows or reasonably should know about student on student harassment that creates a hostile environment, Title IX requires the school take immediate action to eliminate the harassment, prevent its recurrence and address its effects. Moreover, "OCR" requires schools to ensure that their employees are properly trained so they know how to report harassment to appropriate school officials and that employees with the authority to address harassment know how to respond promptly. The training for employees must include practical information on how to identify and report sexual harassment and violence including training of employees likely to witness or receive reports of sexual harassment and violence, which includes teachers,

school law enforcement, administrators, counselors and health personnel and resident advisors. Schools are obligated to conduct a Title IX investigation, even if the sexual assault or harassment occurred off campus grounds.

36. A school that knows or reasonably should know about possible harassment must promptly investigate to determine what occurred and take appropriate steps to resolve the situation. "OCR" reminds schools that a police investigation which is being conducted regarding the same allegations does not relieve the school of its independent Title IX obligation to investigate the conduct. Moreover, "OCR" indicates that the schools inquiry must in all cases be prompt, thorough and impartial and in cases involving potential criminal conduct, the school personnel must determine, consistent with state and local law, whether appropriate law enforcement or other authority should be notified. Even where a complainant requests confidentiality, such a request does not relieve the school of its obligation to investigate and promptly respond to complaints of sexual assaults.

37. One means by which "OCR" reminds colleges of compliance with Title IX is to ensure that they publish a notice of nondiscrimination, designate an employee to coordinate Title IX compliance and adopt and publish grievance procedures that can serve as preventive measures against harassment. Training for administrators, teachers, staff and students can also help ensure that they understand what types of conduct constitute sexual harassment or violence and can identify warning signals that may need attention and how to respond.

38. "OCR" sets forth specific policies and procedures that are required for schools to follow pertaining to sexual harassment and sexual violence. Specifically, the school must (a) disseminate a notice of nondiscrimination, (b) designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX and (c)

adopt and publish grievance procedures for prompt and equitable resolution of student and employee discrimination complaints. "OCR" states that the requirements apply to all forms of sexual harassment including sexual violence and are important for preventing and effectively responding to sex discrimination. "OCR" requires schools to examine their current policies and procedures on sexual harassment and sexual violence to determine whether those policies comply with the requirements articulated in the "DCL" and the 2001 guidance, and if changes are necessary, the school should implement changes as needed.

39. "OCR" specifies the type of notice of nondiscrimination that is required and that it must be widely distributed to all students, employees, applicants for admission and employment and other relevant persons. "OCR" also recommends that the notice be prominently posted on school websites and at various locations throughout the school campus and published in electronic and printed publications of general distribution that provide information to students and employees about the school services and policies.

40. "OCR"'s policies warned that a school's general policy prohibiting sex discrimination will not be considered effective and would constitute a violation of Title IX under certain circumstances. Therefore, "OCR" recommended that a school's nondiscrimination policy state that prohibited sex discrimination covers sexual harassment including sexual violence and that the policy include examples of the types of conduct it covers. At all relevant times "MIT" failed to comply with these guidelines.

## COUNT I
## <u>VIOLATION OF TITLE IX AGAINST DEFENDANT MIT</u>

41. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 40 of this Complaint as more fully stated herein.

42. "MIT's" acts and failure to act with respect to sexual assaults and/or abuse on its college

campuses and online programs and "Harbi's" allegations of sexual harassment by an "MIT" professor deprived "Harbi" of her rights on the basis of her gender.

43. The online sexual harassment suffered by "Harbi" is, by nature, discriminatory on the basis of her female gender.

44. "MIT" and its servants, agents and/or employees had actual and/or constructive notice of the harassment by "Lewin". These servants, agents and/or employees had the duty and authority to address this type of conduct.

45. "MIT" and its servants, agents and/or employees had actual and/or constructive notice of other past sexual harassment perpetuated by "Lewin" that occurred before "Harbi" reported her harassment. "MIT" failed to properly act to ensure the safety of online courses, and failed to adequately implement policies designed to educate their students and administrators and protect their students in violation of Department of Education, Office of Civil Rights regulations and guidelines.

46. "MIT" and its officials and officers responded to "Harbi's" complaint by failing to act and/or acting with deliberate indifference or in a manner clearly unreasonable in light of the known circumstances.

47. "MIT" failed to implement proper policies and thus failed to investigate "Harbi's" reported sexual harassment in any meaningful way.

48. "MIT" took no steps to provide useful academic support or to otherwise accommodate "Harbi" after she reported the harassment.

49. "MIT's" failure to act in an effective manner resulted in "Harbi" suffering emotional distress with physical ailments and attempting to commit suicide, thereby exacerbating her impaired mental state arising from the harassment and effectively denying her access to the

educational benefits and opportunity from either "MIT" or from any other college or university.

50.  "MIT's" response to "Harbi's" complaint of sexual harassment was not reasonably calculated to, and thereby failed to, end the discriminatory conduct faced by "Harbi".

51.  "MIT's" responses to "Harbi's" complaint were not reasonably calculated to prevent this type of discrimination from recurring on campus.

52.  "MIT" failed to restore "Harbi" to pre-deprivation status.

53.  The sexual harassment perpetrated upon "Harbi" was perpetrated by an "MIT" professor utilizing "MIT" resources and acting as an actual or apparent agent of "MIT" at all relevant times.

54.  The harassment on "Harbi" involved conduct so severe and objectively offensive that it deprived "Harbi" of her educational access and benefits.

55.  At all relevant times, "MIT" received federal funds.

56.  "MIT's" procedures failed to meet the requirements of Title IX and the Department of Education OCR guidelines. These failures included, but were not limited to:

    a.  Failure to properly educate and train their professors, administrators, servants, agents and/or employees about sexual harassment and assaults.

    b.  Failure to properly educate their students about sexual assaults and their Title IX rights.

    c.  Failure to provide and implement adequate timelines for the prompt investigation and resolution of complaints.

    d.  Failure to ensure that decisions will be reached promptly and implemented regarding complaints of sexual harassment.

e.   Failure to define which Title IX procedures are available through "MIT", how they overlap, and under what circumstances they may be implemented.

f.   Failure to act proactively and affirmatively in conducting climate checks to determine whether there was a climate or culture of sexual harassment or violence against students.

g.   Failure to monitor its online course communications between "MIT" affiliated agents and students for inappropriate or illegal conduct.

h.   Failure to provide effective and adequate mental health and medical services to assist students abused by "MIT" affiliated agents.

57.   In addition, "MIT's" procedures placed the burden on the complainant to initiate all relevant procedures to resolve fully a complaint of sexual abuse. The requirement of Title IX that procedures be equitable is to ensure that the reporting process is not dependent upon a complainant's inner fortitude and tenacity.

58.   "MIT's" procedures are on their face, and in their application, inequitable because there are not enforced uniformly and are not easy to follow, thus functioning as a barrier to complaints.

59.   "MIT" has fostered and perpetuated a hostile education environment on the basis of sex on its campus and through its online courses in violation of Title IX and its implementing regulations. "MIT" and their administrators failed to take seriously sexual harassment complaints, did not attempt to ensure the safety of online courses, and did not provide their students with the proper resources they needed to handle these assaults. Instead, they left their female students, who had been sexually harassed, isolated and afraid to come forward for fear of being re-victimized and humiliated.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "MIT", together with punitive damages, attorney's fees, with interest and costs.

## COUNT II
## NEGLIGENCE AGAINST DEFENDANT MIT

60. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 59 of this Complaint as more fully set forth below.

61. "MIT", through its school publications and by other means, acknowledged and accepted its duty to protect its students, including "Harbi" and to provide a safe environment for them both on campus and online.

62. "MIT" had a duty to implement and enforce the school's published guidelines, codes, regulations, and policies designed to protect its students.

63. "MIT's" own publications acknowledge that sexual assaults and harassment at universities are foreseeable circumstances.

64. "MIT" failed to take reasonable precautions to safeguard its students and to comply with all applicable federal regulations and guidelines issued by the Department of Education Office of Civil Rights.

65. "MIT's" lax monitoring of its own online activities created an environment in which online sexual misconduct was manifestly foreseeable, and accepted it, ignored it, and allowed this type of misconduct to proliferate.

66. "MIT" had a duty to protect online students from sexual harassment and it breached its duty to "MIT's" students, including "Harbi".

67. The breaches committed by "MIT" proximately caused severe physical and psychological injuries to "Harbi".

68. The illegal, wrongful and negligent acts committed by "MIT" resulted in "Harbi's"

persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she

suffered in the absence of the school's support, and in the face of the school's manifest

disregard of the duties it owed to her.

69.   "Harbi" endured months of pain and suffering following the sexual harassment, which was

caused by "MIT's" negligence and disregard towards online sexual abuse, and towards its

obligations both prior to and after the attack occurred and the complaint was filed.

70.   By reason of the above, "Harbi" was subjected to conscious pain and suffering, loss of the

educational opportunities, and loss of earning capacity caused by "MIT" from the day she

enrolled in the physics course with ""Lewin"" in November 2013 to the present.

71.   By reason of the actual and/or apparent agency and through vicarious liable based upon the

relationship between "MIT" and "Lewin", "MIT" is responsible and liable for the

negligence and improper conduct of "Lewin".

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "MIT", together with

punitive damages, attorney's fees, with interest and costs.

## COUNT III
## NEGLIGENCE AGAINST DEFENDANT WALTER LEWIN

72.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 71 of this

Complaint as more fully set forth below.

73.   "Lewin", had a duty to protect "MIT's" students, including "Harbi" and to provide a safe

environment for her as an online student and to prevent sexual harassment of Plaintiff

"Harbi".  At all relevant times in his interaction with "Harbi", "Lewin" was acting as the

actual or apparent agent of "MIT"

74.   "Lewin" knew or should have known that sexual assaults and harassment in an education

setting such as the online course "Harbi" enrolled in are prohibited and wrongful.

14

75. "Lewin" created an environment in which online sexual misconduct was manifestly foreseeable, and "MIT" and "Lewin" accepted it, ignored it, and allowed this type of misconduct to proliferate.

76. "Lewin" breached his duty to "MIT's" students, including "Harbi".

77. The breaches committed by "Lewin" proximately caused severe physical and psychological injuries to "Harbi".

78. The illegal, wrongful and negligent acts committed by "Lewin" resulted in "Harbi's" persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of "MIT's" manifest disregard of the duties they owed to her.

79. "Harbi" endured months of pain and suffering following the sexual harassment, which was caused by "Lewin's" improper conduct and disregard towards online sexual abuse, and towards his obligations both prior to and after the attack occurred and the complaint was filed.

80. By reason of the above, "Harbi" was subjected to conscious pain and suffering, loss of the educational opportunities, and loss of earning capacity caused by "Lewin" from the day she enrolled in the physics course with "Lewin" in November 2013 to the present.

81. "Lewin" is responsible and liable for his negligence.

   **WHEREFORE**, Plaintiff demands judgment against the Defendant, Walter "Lewin", together with punitive damages, attorney's fees, with interest and costs.

## COUNT IV
## <u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>
## <u>AGAINST DEFENDANT MIT</u>

82.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 81 of this

15

Complaint as if more fully set forth below.

83.   The elements of a claim of negligent infliction of emotional distress are:

      a.   The defendant engaged in negligent conduct or a willful violation of a statutory standard;

      b.   The plaintiff suffered serious emotional distress;

      c.   The defendant's negligent conduct or willful violation of statutory standards was a cause of the serious emotional distress.

84.   "MIT" engaged in negligent conduct, when the defendant breached its duty to not only implement adequate policies designed to protect "MIT's" students on campus and online, but also to enforce those published guidelines, codes, regulations, and policies.

85.   "MIT" also engaged in negligent conduct when they breached their duty to protect their students from sexual assault using "MIT's" own online resources. "MIT's" publications acknowledge that sexual assaults at colleges are foreseeable circumstances and "MIT" and its servants, agents and/or employees had a duty to protect online students from sexual harassment.

86.   "Harbi" suffered emotional stress, and the post traumatic emotional stress was so serious that a reasonable person would not have been able to cope with the mental distress caused by the circumstances. In fact, "Harbi" attempted to take her own life and began self-mutilating due to "MIT's" negligent conduct.

87.   The defendant's negligence caused "Harbi" to suffer this emotional distress.

88.   The illegal, wrongful, and negligent acts committed by "MIT", and persons for whose conduct it was responsible, resulted in "Harbi's" persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's

support, and in the face of the school's manifest disregard of the duties it owed to her.

89.    "Harbi" endured months of pain and suffering following the abuse, which was caused by "MIT's" blatant indifference towards her perpetrated by an "MIT" professor, and towards its obligations both prior to and after the attack occurred and the complaint was filed.

90.    By reason of the above, "Harbi" was subjected to conscious pain and suffering, loss of the educational opportunities, and loss of earning capacity caused by "MIT" from the day she enrolled in the physics course November 2013 to the present.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "MIT", together with punitive damages, attorney's fees, with interest and costs.

## COUNT V
## <u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>
## <u>AGAINST DEFENDANT WALTER LEWIN</u>

91.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 90 of this Complaint as if more fully set forth below.

92.    The elements of a claim of negligent infliction of emotional distress are:

     a.    The defendant engaged in negligent conduct or a willful violation of a statutory standard;

     b.    The plaintiff suffered serious emotional distress;

     c.    The defendant's negligent conduct or willful violation of statutory standards was a cause of the serious emotional distress.

93.    "Lewin" also engaged in negligent conduct when he breached his duty to protect his students from sexual assault using "MIT's" own online resources. "Lewin" knew or should have known that sexual assaults at colleges are foreseeable circumstances and "Lewin" failed to take the necessary precautions to safeguard and protect their students.

2ae0e0f84a93eecc

94. "Harbi" suffered emotional stress, and the post traumatic emotional stress was so serious that a reasonable person would not have been able to cope with the mental distress caused by the circumstances. In fact, "Harbi" attempted to take her own life and began self-mutilating due to "Lewin's" negligent conduct.

95. The defendant's negligence caused "Harbi" to suffer this emotional distress.

96. The illegal, wrongful, and negligent acts committed by "Lewin" resulted in "Harbi's" persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

97. "Harbi" endured months of pain and suffering following the abuse, which was caused by "Lewin's" blatant negligence towards her perpetrated by him.

98. By reason of the above, "Harbi" was subjected to conscious pain and suffering, loss of the educational opportunities, and loss of earning capacity caused by "Lewin" from the day she enrolled in the physics course November 2013 to the present.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, Walter "Lewin", together with punitive damages, attorney's fees, with interest and costs.

### COUNT VI
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST WALTER LEWIN

99. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 98 of this Complaint as if more fully set forth below.

100. The elements of a prima facie case for the tort of intentional infliction of emotional distress are:

    a.    outrageous conduct by the defendant;

b.    the defendant's intention of causing or reckless disregard of the probability of causing emotional distress;

c.    the plaintiff's suffering severe or extreme emotional distress; and

d.    actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

101.    "Lewin's" sexually explicit and abusive conduct via email, Skype, and Facebook was outrageous, insensitive, and highly offensive towards "Harbi".

102.    The online sexual harassment perpetrated by "Lewin" caused "Harbi" to suffer from extreme emotional distress as evidenced by her self-mutilation shortly thereafter. As a result of "Lewin's" intentional conduct, "Harbi" was caused to sustain severe and permanent emotional distress with associated physical injuries.

103.     "Lewin's" extreme and outrageous conduct in the form of sexual harassment was sufficiently insensitive and abusive as to intentionally cause "Harbi" severe emotional distress.

104.    In perpetrating the online sexual harassment, "Lewin" exhibited a reckless disregard of the probability of causing "Harbi" severe emotional distress, particularly because he had explicit knowledge that "Harbi" was a vulnerable target given her history of sexual abuse.

105.    "Harbi" endured months of pain and suffering following the attack, and that suffering continues today.

106.    By reason of the above, "Harbi" was subjected to conscious pain and suffering caused by "Lewin" from the day he began his online sexual harassment campaign until she reported the harassment to "MIT".

107.     "Lewin" acted with actual malice, or so recklessly or wantonly to permit the inference of

malice, to establish punitive damages.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "Lewin", together

with punitive damages, attorney's fees, with interest and costs.

**COUNT VII**
**ASSAULT AND BATTERY AGAINST WALTER LEWIN**

108.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 107 of this

Complaint as if more fully set forth below.

109.  "Lewin" assaulted and battered "Harbi" without her consent, all to "Harbi's" great damage.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "Lewin", together with

punitive damages, attorney's fees, with interest and costs.


The Plaintiff,
By Her Attorney,

_/s/ David P. Angueira_
David P. Angueira
BBO# 019610
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
T: (617) 742-1900
F: (617) 367-7193

Date:   November 23, 2016