UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FAÏZA HARBI | * | |
| | * | |
| Plaintiff, | * | |
| | * | **PLAINTIFF CLAIMS** |
| v. | * | **TRIAL BY JURY** |
| | * | |
| MASSACHUSETTS INSTITUTE OF | * | |
| TECHNOLOGY, and WALTER LEWIN | * | |
| | * | |
| Defendants. | * | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

This cause of action arises from Defendants' deliberately indifferent response to teacher-on-student sexual harassment, Defendants' failure to comply with all Title IX requirements and to promptly and appropriately investigate and respond to teacher-student harassment creating a hostile environment and effectively denying her access to educational opportunities. This action alleges teacher-student sexual harassment, violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 168, Mass. Gen. Laws ch. 214 §1C, breach of contract as well as claims of negligence, negligent infliction of emotional distress, intentional infliction of emotional distress and assault.

## PARTIES AND JURISDICTION

1. The Plaintiff, Faïza Harbi, (hereinafter "Harbi") resides in Montpellier, France.

2. The Defendant MIT is a private institution of higher learning that receives federal funding, and is located in Boston, Massachusetts.

3. The Defendant, Walter Lewin (hereinafter "Lewin") at all times relevant to this lawsuit was a professor at the Massachusetts Institute of Technology (hereinafter "MIT"), with a principal place of business at 139 Cushing Street, Cambridge, Massachusetts 02138.

1

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331

(federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction) and the

doctrines of ancillary and pendent jurisdiction

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because "MIT" is located in

this judicial district and a substantial part of the events which give rise to the claims herein

occurred in this district.

## FACTS COMMON TO ALL CAUSES OF ACTION

6.    In August 2013, "Harbi" enrolled in the EDX 'For The Love Of Physics' course (8.01X)

taught by "Lewin" and promulgated and/or sponsored by "MIT". The class began in

September, 2013.

7.    On or about May 2, 2012 "MIT" and Harvard University announced a partnership in online

education. Through EDx, "MIT" offered online versions of "MIT" courses which provided

opportunities for professor to student interactivity. Online students who were able to

demonstrate the knowledge of the course material received certificates of mastery from

"MIT" for a fee to be paid by the student upon successful completion of the course

material. Through EDx, "MIT" offered 8.01X, the online version of Classical Mechanics,

which is the first of "MIT's" introductory physics courses. The course followed the "MIT"

on-campus class as it was given by "Lewin" in the fall of 1999 and also included his video

lectures, problem-solving sessions and his famous in-class demonstrations. The EDx

website also noted that "Lewin" had supplemented his lectures by including interactive

questions to help students check their understanding during the lectures themselves. The

course description set forth by "MIT" the course requirements and stated that a student's

estimated effort to successfully complete the course was 12 hours per week. The course

description also listed the core staff including "Lewin" and described him as an extraordinary educator who had received five teaching awards and is the only "MIT" professor featured in the best 300 professors of the Princeton Review.

8.  In the summer of 2013, "Harbi" registered for the 8.01X course as a student which began on September 9, 2013 and ran through January 15, 2014. "Harbi" was seeking to obtain her certificate of mastery offered by "MIT" through this course. "MIT", "Lewin" and "Harbi" entered into a contractual relationship whereby "MIT" and "Lewin" agreed to provide "Harbi" with an educational environment free from sexual harassment. The agreement also provided that if "Harbi" completed the course materials successfully, she would receive a certificate of mastery in physics from "MIT". The terms of the contract included "MIT" policies and procedures prohibiting sexual harassment of students by teachers.

9.  Shortly after "Harbi" began her coursework with Lewin, he engaged in a pattern of sexual harassment which interfered with "Harbi's" enjoyment of her education thereby breaching the contract and causing "Harbi" to lose her educational opportunity. Neither "MIT" nor Lewin did anything to mitigate "Harbi's" damages.

10. At all relevant times, "Lewin" was engaged as a staff member and professor of the "MIT" faculty providing course lectures and course materials to "Harbi" as a student enrolled in the online course for credit.

11. At all relevant times, that "Lewin" interacted with "Harbi", he was obligated to comply with "MIT's" policies and procedures imposed on "Lewin" in conjunction with his work as a professor and staff member of "MIT". The policies and procedures are contained within "MIT's" Policies and Procedures: A Guide For Faculty and Staff Members. The manual was a published document which was provided to "Lewin" and which he understood he

had to comply with in order to fulfill his responsibilities as a staff member of "MIT".

Additionally, apart from his contractual duties and agreeing to comply with these policies

and procedures, "Lewin" voluntarily assumed the duty of complying with these policies

and procedures in order to protect the integrity of "MIT's" educational program and the

education of the students enrolled in these lectures including "Harbi".

12.  The policies and procedures, specifically sections 9.6.3.1 and 9.6.5.3 in relevant part stated

as follows:

> • It is the policy of the Institute that its ... faculty, ... and others acting on its behalf have
> the obligation to avoid ethical, ... or other conflicts of interest and to ensure that their
> activities and interests do not conflict with their obligations to the Institute or its welfare.
> Policies, §4.4 (Conflict of Interest).
> • Other potential conflicts of interest may arise from opportunities that an individual may
> have to influence or to be influenced improperly by personal relationships, in ways that
> are not consistent with the education and employment policies and the principles to
> which M IT is committed.  Potential conflicts of interest of a particularly sensitive nature
> may arise out of sexual relationships, especially in the context of educational or
> employment supervision and evaluation. *Id.*
> • All members of the "MIT" community are expected to conduct themselves with proper
> respect for one another .... The Institute fosters the attitude that ... every individual
> deserves to be treated, judged, and accorded both common decencies and all the benefits
> of society in ... [a] respectful manner.  Policies, §9.1 (Personal Conduct and
> Responsibilities Towards Students and Employees).
> • "MIT" is committed to creating an environment in which every individual can work,
> study, and live without being harassed. Policies, §9.5 (Policy on Harassment)
> • Harassment is any conduct, verbal or physical, on or off campus, that has ... [the] effect
> of unreasonably interfering with an individual['s] ... educational ... performance at "MIT"
> or that creates an intimidating, hostile, or offensive educational, ... environment. *Id.*
> • Sexual harassment may take many forms.  Sexual assault and requests for sexual favors
> that affect educational or employment decisions constitute sexual harassment.  However,
> sexual harassment may also consist of unwanted physical contact, requests for sexual
> favors, visual displays of degrading sexual images, sexually suggestive conduct, or
> offensive remarks of a sexual nature.  *Id.*
> • All members of the "MIT" community are expected to conduct themselves with proper
> respect for one another.   Policies, §9.7 (Relations with Students and Student Conduct).
> • Off-campus misconduct may be the basis for "MIT" disciplinary actions.  *Id.*

At all relevant times, these policies and procedures were in effect including while "Harbi" participated in her interactions with "Lewin".

13. "Harbi" decided to take the "MIT" course due to her love of learning and to also obtain a Certificate of Mastery from Professor "Lewin" due to his association with "MIT" and his perceived reputation.

14. Many EDX courses had a Facebook page where students could assist each other with assignments. Because 'For The Love of Physics' did not have a page, "Harbi" created one. This was a closed group and students had to apply to join. "Harbi" and the other administrators could either accept or decline the request as well as ban users from the group.

15. On November 24, 2013, "Lewin" requested to join the Facebook group. "Harbi" believed this to be a prank, and requested that "Lewin" send her an email to her EDX address which only the professor of the course would have access to. Shortly thereafter, she received an email with a snapshot of her course progress and accepted "Lewin's" request to join the Facebook group. "Lewin" commented that she was doing very well.

16. Shortly thereafter, "Harbi" disclosed to "Lewin" that her concentration in class may be affected by her medication, to which "Lewin" inappropriately responded with "what medication do you take and why?"

17. In another email shortly thereafter, "Lewin" asked "what happened that caused your depression, to which "Harbi" responded by detailing her history of being the victim of a sexually abusive upbringing.

18. "Lewin" responded to "Harbi's" detailed description of her past abuses with sexually

explicit terminology, which was just the beginning of numerous inappropriate emails and messages between him and "Harbi".

19. Approximately three weeks after this initial contact, "Harbi" received a friend request from "Lewin" on Facebook. "Harbi" and "Lewin" then began communicating by messenger and eventually began video messaging on Skype as well.

20. Upon becoming Facebook friends with "Harbi", "Lewin" explicitly suggested to "Harbi" that becoming friends will help her to regain self confidence and also implied success in his classes suggesting a quid pro quo for success in his class.

21. In early December 2013, the conversations between "Harbi" and "Lewin" turned even more explicit, with "Lewin" disclosing to her that he "wanted her body in a sexual way." "Harbi" explicitly stated to "Lewin" that she does not feel the same way about him.

22. "Lewin" continued to improperly influence and sexually harass "Harbi" online throughout her time as a student in the "MIT" EDX course, again implying that her success with the class could be affected by her relationship with "Lewin", creating a quid pro quo hostile educational environment constituting sexual harassment.

23. Throughout the subsequent months, "Harbi" did not break contact with "Lewin" for fear of being removed from the EDX course. This fear stemmed in part from her past abuse as well as from specific statements made by "Lewin" as discussed in "MIT's" report that was conducted after "Harbi" complained about "Lewin's" conduct. Specifically, after "Harbi" had begun disclosing personal information about herself to "Lewin" and expressing concerns about her ability to successfully complete the course due to her mental state and medication, "Lewin" sent an email to "Harbi" stating "of course you will get the certificate you are doing well. If needed I could make it happen."  Furthermore, in a subsequent email

sent to "Harbi" after she had disclosed details about being raped to "Lewin," "Lewin" stated "I will try to help you (some) in restoring your self confidence. For sure you will pass 8.01x." This constituted a quid pro quo hostile environment of sexual harassment. In an attempt to end "Lewin's" persistent and harassing requests and continue with her education, "Harbi" sent him revealing photographs.  At all relevant times "Harbi" believed that "Lewin" was acting as an "MIT" professor and her completed class performance was dependent on satisfying "Lewin's" requests.

24. "Harbi" and "Lewin" also communicated via Skype video sessions during which "Lewin" performed sexually explicit acts including exposing his genitalia and masturbating. Additionally, "Lewin" sent "Harbi" nude photographs on multiple occasions, some of which were sent through his "MIT" email furthering confirming his association with "MIT". Often these communications were offensive and depicted "Lewin's" demeanor as threatening and intimidating causing visible distress of "Harbi's" vulnerable psychological condition.

25. "Lewin" used his "MIT" email to send not only explicit images, but highly inappropriate written messages that, at all times relevant, were sent through the "MIT" email server. At all relevant times, "MIT" had complete control and access to "Lewin's" email connectivity and the right to monitor and read many of these communications.

26. In August 2014, upon realizing that the online sexual activity instigated by "Lewin" was highly inappropriate, "Harbi" began to self-mutilate and was hospitalized. At all relevant times, "Harbi" was incompetent to consent to "Lewin's" sexual advances, due to her state of mind, as disclosed to "Lewin". Shortly thereafter, "Harbi" began counseling sessions to deal with her emotional distress caused by "MIT's" and "Lewin's" sexual harassment.

27. Prior to these inappropriate contacts with "Lewin", "Harbi" had achieved some semblance of a work and intellectual life with her online course taking, successfully completing a few courses and was feeling better about herself.

28. "Lewin's" online manipulation and sexual harassment seriously and profoundly exacerbated "Harbi's" symptoms and she developed significant physical symptoms including self-mutilation, inability to sleep, extreme anxiety and other symptoms of Post-Traumatic Stress Disorder ("PTSD"). She developed these symptoms as a direct result of "Lewin's" inappropriate sexual harassment and began intensive therapy to help deal with her numerous symptoms of PTSD, including, severe anxiety, sleep deprivation and self-mutilation.

29. "Lewin" improperly used his association with "MIT" and his position to induce "Harbi" to engage in an inappropriate relationship with his student in exchange for her perceived belief that her academic performance was dependent on "Lewin".  At all relevant times, "MIT" and "Lewin" developed a special relationship as student and teacher. This created a duty of care on the part of "MIT" and "Lewin" to prevent sexual harassment against their student "Harbi". "Lewin" and "MIT" voluntarily assumed a duty of care to ensure that their student was treated equally as any other "MIT" student and not subjected to sexual harassment.

30. On October 7, 2014, "Harbi" reported "Lewin's" conduct to "MIT". During "MIT's" investigation, "Harbi" provided documents that were reviewed by "MIT", who determined that "Harbi's" complaint warranted a formal review.

31.  "MIT" conducted an investigation and on December 2, 2014, informed "Harbi" of the results and issued a report hereinafter referred to as the "MIT" Report (attached hereto as

Exhibit A).

32.  "MIT" found that "Lewin's" conduct "violated "MIT's" Policies and Procedures, including

Sections 9.5 Policy on Harassment, 4.4 Conflict of Interest, 9.1 Personal Conduct and

Responsibilities Towards Students and Employees, and 9.7 Relations with Students and

Student Conduct." "MIT" specifically found that "Lewin's" conduct violated "MIT's"

policies because "MIT" has a policy stating that as a student in a virtual course offered

through "MIT's" online educational platform, "Harbi" deserved the same respectful

treatment and common decencies that are encouraged and fostered by "MIT's" policies for

all members of the "MIT" community and that are afforded to those students who attend

classes on "MIT's" campus.

33.  "Lewin" was contractually obligated and voluntarily assumed the duty to adhere to all of

these policies and procedures as a condition of his employment and/or association with

"MIT".

34.  "MIT's" policies defined sexual harassment to include unwanted requests for sexual favors,

sexually suggestive conduct, or offensive remarks of a sexual nature.

35.  In response to "Harbi's" complaints, despite "Lewin" stating that he only engaged in sexual

communications with "Harbi"  to try to help her restore self confidence, "MIT" severed

ties with "Lewin" and prohibited him from accessing "MIT" resources.  "MIT" failed to

assist "Harbi" with the harm "Lewin" and "MIT" had caused her, including failing to offer

any remedial assistance including counseling.

36.   In the "MIT" Report, "MIT" did not indicate that it would initiate any type of additional

training sessions for their instructors, employees, staff or students to educate them on

sexual abuse on campus and in online course work, nor did it offer any remedial services

for "Harbi". "MIT" also failed to further investigate whether the admitted acts of sexual

harassment or misconduct by "Lewin" with other women involved other "MIT" students.

37.    In the "MIT" report, "Lewin" indicated that this was not the first instance of sexual

harassment perpetrated by him towards other women. "Lewin" specifically stated "I had

done that before through Facebook. I taught another woman how to masturbate, and she

learned she could do it." "Lewin" further acknowledged that he has sent sexually explicit

pictures to someone else (Woman A) "probably this year-very recently." "Lewin" also

stated that he sent "a different picture at a different time" to another woman (Woman B),

and also exchanged pornographic images 'back and forth' with her on Facebook. In

response to "Lewin's" disclosure that he had engaged in sexually explicit conversations

and sent sexually explicit pictures to other women, "MIT" asked "Lewin" whether Woman

A and Woman B were adults, meaning over the age of 18. "MIT's" report fails to indicate

whether these other victims of "Lewin's" sexual predator conduct were also "MIT"

students. "MIT" did not try to determine whether these acts were committed against other

"MIT" students.

38.    In the "MIT" Report, "Lewin" also revealed that during his communications with "Harbi"

he viewed "Harbi" as "terribly distorted mentally" as a result of rapes she had endured as a

child and that he felt that she was "clearly not over" the rapes.

39.    In the "MIT" Report, "Lewin" was specifically asked if he thought his remarks to "Harbi"

regarding masturbation were appropriate. "Lewin" replied "I was raised in a Dutch culture,

whereby a subject like this is openly discussed. We [the Dutch] have a much more direct

approach, which can hurt people too by the way."  "Lewin" claimed that he believed his

interactions with "Harbi" were appropriate while acknowledging they could be harmful.

40.   At all times relevant, "MIT" had access to their internal servers, the EDX courses, and professors' email addresses and all communications between "Lewin" and "Harbi" went through its server or computer system.

41.   At all relevant times prior to and during "Harbi's" online course, "MIT" knew or should have known that "Lewin" was engaged in inappropriate conduct with students while utilizing his "MIT" affiliation, based upon the admissions by "Lewin".

42.   At all relevant times "MIT" permitted "Lewin" to use his "MIT" affiliation and email creating an actual and/or apparent agency relationship between "MIT" and "Lewin".

43.   When "Lewin" was investigated regarding the complaints filed by "Harbi", he was asked whether or not his remarks to "Harbi" in his reply emails were appropriate. "Lewin's" remarks were directed to information "Harbi" provided to "Lewin" regarding details of her sexual assaults as a child by her uncle, during which time she disclosed to "Lewin" that she had been raped by her uncle at the age of 3 1/2. "Lewin" began to inquire of "Harbi" details regarding her personal relationship as a child and her personal relationship with her husband including the quality of their sexual relationship. In response to "Harbi's" painful disclosure of the psychological trauma that she has sustained including informing "Lewin" that she was suffering from depression and PTSD, "Lewin" responded by email as follows:

> wowwwwwwwwwwwww you were raped at age 3.5
>
> That is gross.   Your vagina was too small for you uncle's dick.  It must have hurt like
> hell.  I am amazed you still remember.  3.5 yr old.  You were raped again at age 11.
> Does that mean he did not rape you for 7.5 years?
>
> It's shocking that he is not in jail.
>
> I will try to help you (some) in restoring your self confidence.

For sure you will pass 8.0I x.

When "Lewin" was asked whether he thought his remarks to Harbi in his reply email were appropriate, he responded as follows:

"What is appropriate for some? I thought it was appropriate." When asked to explain why he felt it was appropriate, Professor Lewin stated, "Why? Why do I like oysters? I thought it was [appropriate]. I was raised in a Dutch culture, whereby a subject like this is openly discussed.
We [the Dutch] have a much more direct approach, which can hurt people too by the way. You, as an American, would not have thought this was appropriate. For me, it's fine."[26]

Professor Lewin was also asked whether he would have said the same thing to a student who had come to his office at "MIT" and made a similar revelation. Professor Lewin stated, "[I]f a student at "MIT" who came to me during office hours said this, I would have said the same thing."[27]

Professor Lewin then told the Investigators that he had "two things in mind" when he told "Harbi" in his reply email "I will try to help you (some) in restoring your self confidence."

First, he stated that he thought he would "give her a boost through friendship" by making her a Facebook friend.[28] Second, he stated that he wanted to "talk her out of the depression," and also thought that he "might be able to get her back on the road sexually." Professor Lewin then stated, "I had done that before, through Facebook. I taught another woman how to masturbate, and she learned she could do it. She went bananas, and it opened up her whole world." Because Professor Lewin's Reply Email does not expressly mention masturbation, the Investigators directly asked him whether he had in mind teaching "Harbi" to masturbate when he stated in his Reply Email that he proposed to help in "restoring her confidence." He said that he did.

44. "Lewin" alleged that he was falling in love with "Harbi", that he wanted her body in a sexual way, that he had raised the subject of masturbation telling her that masturbating was a healthy way to release her anxiety and that he had taught two young girls how to masturbate and feel physical pleasure. Specifically, he told her "If you learn to masturbate it may

enormously help you deal with high pressure and tension." He wanted to teach her to masturbate so she can release her pressure and tension and "Lewin" alleged that it was her hope and his hope that he would teach her how to masturbate. He stated that one of the things he wanted to do was to teach the plaintiff to masturbate and that he felt that she had never had an orgasm and he wanted her to get to that point.

45. In conjunction with his previously reported conduct, Mr."Lewin" engaged in exchanging naked pictures of himself including a picture of his penis and also engaged in Skype video presentations where he would masturbate while talking to the plaintiff. His demeanor during some of these exchanges were threatening to "Harbi" and was intended to cause fear in "Harbi" that there would be severe repercussions if "Harbi" refused to engage in these interactions with "Lewin".

46. "MIT" conducted an investigation that was woefully inadequate and incomplete, in violation of its own policies and procedures governing the Plaintiff's Title IX investigation. "MIT" concluded that "Lewin's" conduct towards "Harbi" constituted sexual harassment in violation of "MIT's" policies which defined sexual harassment to include unwanted requests for sexual favors, sexually suggestive conduct or offensive remarks of a sexual nature. "MIT" policy section 9.5. "MIT" concluded that from the commencement of his communications with "Harbi", "Lewin's" objective was to get "Harbi" back on the road sexually by teaching her to masturbate even though she had not expressed any interest in learning to masturbate. "MIT" concluded that by initiating conversations about sex he made inappropriate inquiries regarding her marital relationship and suggested that "Harbi" was in denial. Moreover, "Lewin" persisted in pursuing a sexual relationship which sexual conduct was not merely suggestive, it was open and it occurred repeatedly during the time

"Harbi" was a student in the "MIT" course. At all relevant times, "Lewin" believed that "Harbi" was terribly distorted mentally and had an inferiority complex which he felt was not too surprising given her history of sexual abuse. Given his awareness of "Harbi's" reported history of multiple rapes by an authority figure, depression and use of anti-anxiety medication and antidepressants and her expressed uncertainty and confusion about sexual behavior, "Lewin" should have taken care to determine whether "Harbi" truly consented to the activity in an informed and willing manner and he did not do so.

47. "MIT" concluded that "Lewin" violated both the letter and the spirit of "MIT's" policies specifically concluding that while "Lewin" was her teacher and "Harbi" was a student, he initiated and pursued sexual activity with her even after "Harbi" stated that she did not view him in a sexual way and expressed her confusion to which "Lewin" persisted in his advances.

48. "MIT" concluded that "Lewin" violated "MIT's" policies by initiating and persisting in pursuing a sexual relationship with "Harbi" in contravention of "MIT's" educational and employment policies, "MIT" policies, section 4.4. Specifically, "MIT" concluded that from the commencement of his communications with "Harbi" "Lewin" recognized and stated to "Harbi" that he had the ability to influence her success in 8.01X. "MIT" found that when "Harbi" raised the concern about obtaining the certificate in the course, "Lewin" stated "Of course you will get the certificate you are doing well if needed I could make it happen but I don't think that will be necessary, I will follow your progress closely." "MIT" concluded that at the same time "Lewin" told "Harbi" that he had the power to intervene on her behalf in the context of her educational supervision and evaluation, he had an undisclosed plan to engage in sexual harassment with her. Once the relationship between "Lewin" and "Harbi"

became sexual, the likelihood that "Lewin" would be influenced by that relationship became even greater as recognized and prohibited by "MIT's" policies. "MIT" policy section 4.4 potential conflicts of interest of a particularly sensitive nature may rise out of sexual relationships, especially in the context of educational or employment supervision and evaluation.

49.   "MIT" also concluded that "Lewin" violated "MIT's" policy regarding personal conduct and responsibilities toward students and employees and "MIT's" policy regarding relations with students. "MIT" concluded that as a student in a virtual course offered through "MIT's" online educational platform, "Harbi" deserved the same respectful treatment and common decencies that are encouraged and fostered by "MIT's" policies for all members of the "MIT" community and that are afforded to those students who attend classes at "MIT's" campus. While "Harbi" was a student in 8.01X, "Lewin" violated these policies. "MIT" confirmed that "Lewin" violated numerous policies and lost sight of the most important relationship he had with "Harbi", namely that of teacher and student which is a special relationship giving rise to a duty of care.

50.   On April 4, 2011 the United States Department of Education (hereinafter "DOE") Office for Civil Rights (hereinafter "OCR") issued a letter to all educational institutions throughout the country to provide further guidance and mandates regarding the increased incidence of sexual assaults occurring throughout the country at college campuses and secondary schools. This letter is commonly referred to as the Dear Colleague Letter[1] (hereinafter "DCL"). "OCR" reminded schools that under Title IX of the Education Amendments of 1972 (Title IX), 20 USC § 1681 et seq. and 34 C.F.R. Part 106,

---

[1] The letter is attached hereto as <u>Exhibit B</u>

discrimination on the basis of sex in education programs or activities operated by recipients of federal financial assistance are prohibited. Moreover, sexual harassment of students, which includes acts of sexual violence, was identified as a form of sex discrimination prohibited by Title IX. In an effort to offer assistance to these various educational institutions in meeting their obligations under federal law, the "DCL" set forth the requirements of Title IX pertaining to sexual harassment which also covers sexual violence and laid out specific Title IX requirements applicable to sexual violence that Emerson was required to follow since 2001.

51. One of the issues identified in the "DCL" related to the reported statistics on sexual violence which were both "deeply troubling and a call to action for the nation". The "DCL" identified a report prepared by the National Institute of Justice that found that one in five women are victims of completed or attempted sexual assaults while in college. The "DCL" describes the schools responsibility to take immediate and effective steps to end sexual harassment and sexual violence. Moreover, the "DCL" also reminded schools that the requirements set out in this letter for the most part had already been in place since "OCR's" revised sexual-harassment guidance which was issued in 2001 (2001 guidance). The "DCL" supplements the 2001 guidance by providing additional guidance and practical examples regarding Title IX requirements as they relate to sexual violence. The "DCL" also provides practical examples regarding Title IX requirements as they relate to sexual violence and identifies the need for educational institutions to take proactive efforts to prevent sexual harassment and violence.

52. As explained in "OCR's" 2001 guidance and the "DCL", when students are sexually harassed, such harassing conduct creates a hostile environment if the conduct is sufficiently

serious that it interferes with or limits the students ability to participate in or benefit from the

schools program. The "DCL" also indicates that the more severe the conduct, the less need

there is to show any repetitive series of incidents to prove a hostile environment, particularly

if the harassment is physical. In fact, the "DCL" identified several Federal Circuit Courts of

Appeals cases that have confirmed that a single isolated incident of sexual harassment may

create a hostile environment, if the incident is sufficiently severe and it identifies a single

instance of rape as being sufficiently severe to create a hostile environment. According to

"OCR", if the school knows or reasonably should know about student harassment that creates

a hostile environment, Title IX requires the school take immediate action to eliminate the

harassment, prevent its recurrence and address its effects. Moreover, "OCR" requires schools

to ensure that their employees are properly trained so they know how to report harassment to

appropriate school officials and that employees with the authority to address harassment

know how to respond promptly. The training for employees must include practical

information on how to identify and report sexual harassment and violence including training

of employees likely to witness or receive reports of sexual harassment and violence, which

includes teachers, school law enforcement, administrators, counselors and health personnel

and resident advisors. Schools are obligated to conduct a Title IX investigation, even if the

sexual assault or harassment occurred off campus grounds.

53. A school that knows or reasonably should know about possible harassment must promptly

investigate to determine what occurred and take appropriate steps to resolve the situation.

"OCR" reminds schools that a police investigation which is being conducted regarding the

same allegations does not relieve the school of its independent Title IX obligation to

investigate the conduct. Moreover, "OCR" indicates that the schools inquiry must in all cases

be prompt, thorough and impartial and in cases involving potential criminal conduct, the school personnel must determine, consistent with state and local law, whether appropriate law enforcement or other authority should be notified. Even where a complainant requests confidentiality, such a request does not relieve the school of its obligation to investigate and promptly respond to complaints of sexual assaults.

54. One means by which "OCR" reminds colleges of compliance with Title IX is to ensure that they publish a notice of nondiscrimination, designate an employee to coordinate Title IX compliance and adopt and publish grievance procedures that can serve as preventive measures against harassment. Training for administrators, teachers, staff and students can also help ensure that they understand what types of conduct constitute sexual harassment or violence and can identify warning signals that may need attention and how to respond. Here, there was a complete absence of and failure by "MIT" to train and educate "Lewin" and his students regarding these matters and "MIT" failed to inform and advise "Harbi" of her legal rights to be free from sexual harassment by her teacher.

55. "OCR" sets forth specific policies and procedures that are required for schools to follow pertaining to sexual harassment and sexual violence. Specifically, the school must (a) disseminate a notice of nondiscrimination, (b) designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX and (c) adopt and publish grievance procedures for prompt and equitable resolution of student and employee discrimination complaints. "OCR" states that the requirements apply to all forms of sexual harassment including sexual violence and are important for preventing and effectively responding to sex discrimination. "OCR" requires schools to examine their current policies and procedures on sexual harassment and sexual violence to determine

whether those policies comply with the requirements articulated in the "DCL" and the 2001

guidance, and if changes are necessary, the school should implement changes as needed.

56.  "OCR" specifies the type of notice of nondiscrimination that is required and that it must be

widely distributed to all students, employees, applicants for admission and employment and

other relevant persons. "OCR" also recommends that the notice be prominently posted on

school websites and at various locations throughout the school campus and published in

electronic and printed publications of general distribution that provide information to

students and employees about the school services and policies. "MIT" has not complied

with these requirements with respect to its online programs.

57.  "OCR's" policies warned that a school's general policy prohibiting sex discrimination will

not be considered effective and would constitute a violation of Title IX under certain

circumstances.  Therefore, "OCR" recommended that a school's nondiscrimination policy

state that prohibited sex discrimination covers sexual harassment including sexual violence

and that the policy include examples of the types of conduct it covers.  At all relevant times

"MIT" failed to comply with these guidelines and their own policies and procedures against

sexual harassment of students.

## COUNT I
## VIOLATION OF TITLE IX AGAINST DEFENDANT "MIT"

58.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 56 of this

Complaint as more fully stated herein.

59.  "MIT's" acts and failure to act with respect to sexual harassment on its college campuses

and online programs and "Harbi's" allegations of sexual harassment by an "MIT" professor

deprived "Harbi" of her rights on the basis of her gender.

60.  The online sexual harassment suffered by "Harbi" is, by nature, discriminatory on the basis

of her female gender.

61.  "MIT" and its servants, agents and/or employees had actual and/or constructive notice of
     the harassment by "Lewin". These servants, agents and/or employees had the duty and
     authority to address this type of conduct.

62.  "MIT" and its servants, agents and/or employees had actual and/or constructive notice of
     other past sexual harassment perpetuated by "Lewin" and that "Lewin" acknowledged
     occurred before "Harbi" reported her harassment. "MIT" had notice and knowledge of the
     prevalence of sexual harassment by virtue of its own survey on sexual assaults conducted
     in 2014 and the numerous incidents of sexual assaults documented in their own Clery Act
     reports which include numerous incidents of sexual harassment assaults of students. "MIT"
     was also a recipient of the Dear College Letter issued by the Department of Education in
     April, 2011. "MIT" was on notice of the epidemic proportion of sexual assaults on college
     campuses. "MIT" failed to properly act to ensure the safety of online courses, and failed to
     adequately implement policies designed to educate and train their students and
     administrators and protect their students in violation of Title IX and "MIT" policies and
     procedures including Department of Education, Office of Civil Rights regulations and
     guidelines and all applicable federal and state laws prohibiting sexual harassment by
     teachers against students.

63.  "MIT" and its officials and officers responded to "Harbi's" complaint inadequately by
     failing to act and/or acting with deliberate indifference to the investigation conducted as a
     result of "Harbi's" complaint or in acting in a manner clearly unreasonable in light of the
     known circumstances.

64.  "MIT" failed to implement proper policies and thus failed to investigate "Harbi's" reported

sexual harassment in any meaningful way.

65.   "MIT" took no steps to provide useful academic or counseling support or to otherwise

accommodate "Harbi" after she reported the harassment nor did "MIT" initiate any type of

additional training sessions for their instructors or students to educate them on sexual abuse

on campus and in online course work. "MIT" did not provide any remedial measures to

assist"Harbi" with completing her coursework or seeking professional counseling services

for her emotional distress.

66.   "MIT's" failure to act in an effective manner resulted in "Harbi" suffering emotional

distress with physical ailments and attempting to com"MIT" suicide, thereby exacerbating

her impaired mental state arising from the harassment and effectively denying her access to

the educational benefits and opportunity from either "MIT" or from any other college or

university.

67.   "MIT's" response to "Harbi's" complaint of sexual harassment was not reasonably

calculated to, and thereby failed to, end the discriminatory conduct faced by "Harbi".

68.   "MIT's" responses to "Harbi's" complaint were not reasonably calculated to prevent this

type of discrimination from recurring on campus.

69.   "MIT" failed to restore "Harbi" to pre-deprivation status.

70.   The sexual harassment perpetrated upon "Harbi" was perpetrated by an "MIT" professor

utilizing "MIT" resources and acting as an actual or apparent agent of "MIT" at all relevant

times.

71.   The harassment on "Harbi" involved conduct so severe and objectively offensive that it

deprived "Harbi" of her educational access and benefits.

72.   At all relevant times, "MIT" received federal funds sufficient to bring it under the

governance of Title IX regulations.

73. "MIT" failed to meet the requirements of Title IX, its own policies and procedures and the
Department of Education OCR guidelines. These failures included, but were not limited to:

   a. Failure to properly educate and train their professors, administrators, servants,
   agents and/or employees about sexual harassment and assaults.

   b. Failure to properly educate their students about sexual assaults and their Title IX
   rights.

   c. Failure to provide and implement adequate timelines for the prompt investigation
   and resolution of complaints.

   d. Failure to ensure that decisions will be reached promptly and implemented
   regarding complaints of sexual harassment.

   e. Failure to define which Title IX procedures are available through "MIT", how
   they overlap, and under what circumstances they may be implemented.

   f. Failure to act proactively and affirmatively in conducting climate checks to
   determine whether there was a climate or culture of sexual harassment or violence
   against students.

   g. Failure to monitor its online course communications between "MIT" affiliated
   agents and students for inappropriate or illegal conduct.

   h. Failure to provide effective and adequate remedial services including academic
   assistance and mental health and medical services to assist students abused by
   "MIT" affiliated agents and other remedial measures to assist "Harbi" with
   completion of her education.

74. In addition, "MIT's" procedures placed the burden on the complainant to initiate all

relevant procedures to resolve fully a complaint of sexual abuse. The requirement of Title

IX that procedures be equitable is to ensure that the reporting process is not dependent

upon a complainant's inner fortitude and tenacity.

75.  "MIT's" procedures are on their face, and in their application, inequitable because there are

not enforced uniformly and are not easy to follow, thus functioning as a barrier to

complaints.

76.  "MIT" fostered and perpetuated a hostile education environment on the basis of sex on its

campus and through its online courses in violation of Title IX, "MIT's" policies and

procedures and its implementing regulations. "MIT" and their administrators failed to take

seriously sexual harassment complaints, did not attempt to ensure the safety of online

courses, and did not provide their students with the proper resources they needed to handle

these assaults. Instead, they left their female students, who had been sexually harassed,

isolated and afraid to come forward for fear of being re-victimized and humiliated.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "MIT", together with

punitive damages, attorney's fees, with interest and costs.

## COUNT II
## NEGLIGENCE AGAINST DEFENDANT "MIT"

77.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 75 of this

Complaint as more fully set forth below.

78.  "MIT", through its school publications, policies and procedures and by other means,

acknowledged and voluntarily assumed a duty to protect its students, including "Harbi," to

monitor the conduct of their employees, and to provide a safe environment for them both

on campus and online.

79.  "MIT" had a duty to implement and enforce the school's published guidelines, codes,

regulations, procedures and policies designed to protect its students.

80.   "MIT's" own publications acknowledge that sexual assaults and harassment at universities are foreseeable circumstances.

81.   "MIT" failed to take reasonable precautions to safeguard its students and to comply with all applicable federal and state laws and guidelines issued by the Department of Education Office of Civil Rights.

82.   "MIT's" lax monitoring of its own online activities created an environment in which online sexual misconduct was manifestly foreseeable, and accepted it, ignored it, and allowed this type of misconduct to proliferate.

83.  "MIT" had a duty to protect online students from sexual harassment and it breached its duty to "MIT's" students, including "Harbi". This duty arises from statutory authority (M. G. L. ch. 214 § 1C), was voluntarily assumed by "MIT" as effected in its policies and procedures, and was created by the nature of the special relationship between a teacher and a student from the contractual relationship between "MIT" and "Harbi".

84.   The breaches committed by "MIT" proximately caused severe physical and psychological injuries to "Harbi".

85.   The illegal, wrongful and negligent acts committed by "MIT" resulted in "Harbi's" pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

86.    "Harbi" endured months of pain and suffering following the sexual harassment, which was caused by "MIT's" negligence and disregard towards online sexual abuse, and towards its obligations both prior to and after the attack occurred and the complaint was filed.

87. As a result of the above, "Harbi" was subjected to pain and suffering, loss of the educational opportunities, and loss of earning capacity caused by "MIT" from the day she enrolled in the physics course with "Lewin" in November 2013 to the present. Specifically,"Harbi" suffered PTSD, began self-mutilating, and experienced symptoms of sleep deprivation, severe anxiety and other symptoms consistent with Post Traumatic Stress Disorder, for which she needed medical treatment and has incurred medical expenses.

88. By reason of the actual and/or apparent agency and through strict vicarious liability based upon the special relationship between "MIT" and "Lewin" and its student "Harbi", and the duties voluntarily assumed by "MIT", "MIT" is responsible and liable for the negligence and improper conduct of "Lewin".

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "MIT", together with punitive damages, attorney's fees, with interest and costs.

## COUNT III
## NEGLIGENCE AGAINST DEFENDANT WALTER LEWIN

89. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 87 of this Complaint as more fully set forth below.

90. "Lewin", had a duty to protect "MIT's" students, including "Harbi" and to provide a safe environment for her as an online student and to prevent sexual harassment of Plaintiff "Harbi".  At all relevant times in his interaction with "Harbi", "Lewin" was acting as the actual or apparent agent of "MIT" and had a special relationship as a teacher with his student. His duty arose from statutory authority (M. G. L. ch. 214 § 1C), the contractual relationship between "Harbi" and "MIT", and his voluntary assumption of duty.

91. "MIT's" policies and procedures 9.1 and 4.4 articulate that as a condition of his employment at "MIT", "Lewin" had a contractual duty of care towards his students to

conduct himself in a professional manner and to avoid ethical, legal, financial, or other

conflicts of interest. "Lewin" agreed to be bound by these duties and voluntarily assumed

said duties.

92.  "Lewin" knew or should have known that sexual assaults and harassment in an education

setting such as the online course "Harbi" enrolled in are prohibited and wrongful. "MIT's"

investigation report reaffirmed that this conduct was wrongful by terminating "Lewin's"

employment at "MIT" because his conduct towards "Harbi" constituted sexual harassment

in violation of "MIT's" policies.

93.  "Lewin" created an environment in which online sexual misconduct was manifestly

foreseeable, and "MIT" and "Lewin" accepted it, ignored it, and allowed this type of

misconduct to proliferate.

94.  "Lewin" breached his duty to "MIT's" students, including "Harbi" by failing to recognize

her incompetent state of mind and engaging her in an inappropriate sexual relationship

when she was unable to consent to such conduct.

95.  The breaches committed by "Lewin" proximately caused severe physical and psychological

injuries to "Harbi".

96.  The illegal, wrongful and negligent acts committed by "Lewin" resulted in "Harbi's"

persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she

suffered in the absence of the school's support, and in the face of "MIT's" manifest

disregard of the duties they owed to her.

97.  "Harbi" endured months of pain and suffering following the sexual harassment, which was

caused by "Lewin's" improper conduct and disregard towards online sexual abuse, and

towards his obligations both prior to and after the attack occurred and the complaint was

26

filed.

98. By reason of the above, "Harbi" was subjected to conscious pain and suffering, loss of the educational opportunities, and loss of earning capacity caused by "Lewin" from the day she enrolled in the physics course with "Lewin" in November 2013 to the present. Specifically,"Harbi" suffered PTSD, began self-mutilating, and experienced symptoms of sleep deprivation, severe anxiety and other symptoms consistent with Post Traumatic Stress Disorder, for which she needed medical treatment and has incurred medical expenses.

99. "Lewin" is responsible and liable for his negligence.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, Walter "Lewin", together with punitive damages, attorney's fees, with interest and costs.

## COUNT IV
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANT "MIT"

100. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 98 of this Complaint as if more fully set forth below.

101. The elements of a claim of negligent infliction of emotional distress are:

   a. The defendant engaged in negligent conduct or a willful violation of a statutory standard;

   b. The plaintiff suffered serious emotional distress;

   c. The defendant's negligent conduct or willful violation of statutory standards was a cause of the serious emotional distress.

102. "MIT" engaged in negligent conduct, when the defendant breached its duty of care to not only implement adequate policies and procedures designed to protect "MIT's" students on campus and online, but also to enforce those published guidelines, codes, regulations, and

policies.

103. "MIT" also engaged in negligent conduct when they breached their duty of care to protect their students from reasonably foreseeable sexual assault while using "MIT's" own online resources. "MIT's" publications acknowledge that sexual assaults at colleges are foreseeable circumstances and "MIT" and its servants, agents and/or employees had a duty to protect online students from sexual harassment.

104. "Harbi" suffered emotional stress, and the post traumatic emotional stress was so serious that a reasonable person would not have been able to cope with the mental distress caused by the circumstances. In fact, "Harbi" attempted to take her own life and began self-mutilating due to "MIT's" negligent conduct.

105. The defendant's negligence caused "Harbi" to suffer this emotional distress.

106. The illegal, wrongful, and negligent acts committed by "MIT", and persons for whose conduct it was responsible, resulted in "Harbi's" persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

107. "Harbi" endured months of pain and suffering following the abuse, which was caused by "MIT's" blatant indifference towards her perpetrated by an "MIT" professor, and towards its obligations both prior to and after the attack occurred and the complaint was filed.

108. By reason of the above, "Harbi" was subjected to conscious pain and suffering, loss of the educational opportunities, and loss of earning capacity caused by "MIT" from the day she enrolled in the physics course November 2013 to the present. Specifically,"Harbi" suffered PTSD, began self-mutilating, and experienced symptoms of sleep deprivation, severe anxiety and other symptoms consistent with Post Traumatic Stress Disorder, for which she

needed medical treatment and has incurred medical expenses.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "MIT", together with punitive damages, attorney's fees, with interest and costs.

## COUNT V
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANT WALTER LEWIN

109.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 107 of this Complaint as if more fully set forth below.

110.  The elements of a claim of negligent infliction of emotional distress are:

    a.    The defendant engaged in negligent conduct or a willful violation of a statutory standard;

    b.    The plaintiff suffered serious emotional distress;

    c.    The defendant's negligent conduct or willful violation of statutory standards was a cause of the serious emotional distress.

111.  "Lewin" also engaged in negligent conduct when he breached his duty of care to adhere to "MIT's" policies and procedures that required him to  conduct himself in a professional manner and to avoid ethical, legal, financial, or other conflicts of interest and  his duty to protect his students from sexual assault using "MIT's" own online resources. "Lewin" knew or should have known that sexual assaults at colleges are foreseeable circumstances and "Lewin" failed to take the necessary precautions to safeguard and protect their students.

112.  "Harbi" suffered emotional stress, and the post traumatic emotional stress was so serious that a reasonable person would not have been able to cope with the mental distress caused by the circumstances. In fact, "Harbi" attempted to take her own life and began self-

mutilating due to "Lewin's" negligent conduct.

113. The defendant's negligence caused "Harbi" to suffer this emotional distress.

114. The illegal, wrongful, and negligent acts committed by "Lewin" resulted in "Harbi's" persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

115. "Harbi" endured months of pain and suffering following the abuse, which was caused by "Lewin's" blatant negligence towards her perpetrated by him.

116. By reason of the above, "Harbi" was subjected to conscious pain and suffering, loss of the educational opportunities, and loss of earning capacity caused by "Lewin" from the day she enrolled in the physics course November 2013 to the present. Specifically, "Harbi" suffered PTSD, began self-mutilating, and experienced symptoms of sleep deprivation, severe anxiety and other symptoms consistent with Post Traumatic Stress Disorder, for which she needed medical treatment and has incurred medical expenses.

   **WHEREFORE**, Plaintiff demands judgment against the Defendant, Walter "Lewin", together with punitive damages, attorney's fees, with interest and costs.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AGAINST WALTER LEWIN

117. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 101 of this Complaint as if more fully set forth below.

118.  The elements of a prima facie case for the tort of intentional infliction of emotional distress are:

   a.    outrageous conduct by the defendant;

      b.    the defendant's intention of causing or reckless disregard of the probability of causing emotional distress;

      c.    the plaintiff's suffering severe or extreme emotional distress; and

      d.    actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

119. "Lewin's" sexually explicit and abusive conduct via email, Skype, and Facebook was outrageous, insensitive, and highly offensive towards "Harbi" as "Lewin's" communications were not consensual but rather an attempt to use his status as a Professor to manipulate "Harbi" into engaging in sexually explicit communications with him.

120. The online sexual harassment perpetrated by "Lewin" caused "Harbi" to suffer from extreme emotional distress as evidenced by her self-mutilation shortly thereafter. As a result of "Lewin's" intentional conduct, "Harbi" was caused to sustain severe and permanent emotional distress with associated physical injuries.

121. "Lewin's" extreme and outrageous conduct in the form of sexual harassment was sufficiently insensitive and abusive as to intentionally cause "Harbi" severe emotional distress.

122. In perpetrating the online sexual harassment, "Lewin" exhibited a reckless disregard of the probability of causing "Harbi" severe emotional distress, particularly because he had explicit knowledge that "Harbi" was a vulnerable target given her history of sexual abuse and he knew that "Harbi" had stated that she was not sexually attracted to him.

123. "Lewin" knew that "Harbi's" emotional distress would result from his actions because when "Lewin" was specifically asked if his remarks to "Harbi" regarding masturbation were appropriate. "Lewin" stated "I was raised in a Dutch culture, whereby a subject like

this is openly discussed.  We [the Dutch] have a much more direct approach, which can hurt people too by the way."

124. "Harbi" endured months of pain and suffering following the attack, and that suffering continues today.

125. By reason of the above, "Harbi" was subjected to conscious pain and suffering caused by "Lewin" from the day he began his online sexual harassment campaign until she reported the harassment to "MIT". Specifically,"Harbi" suffered PTSD, began self-mutilating, and experienced symptoms of sleep deprivation, severe anxiety and other symptoms consistent with Post Traumatic Stress Disorder, for which she needed medical treatment and has incurred medical expenses.

126.  "Lewin" acted with actual malice, or so recklessly or wantonly to permit the inference of malice, to establish punitive damages.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "Lewin", together with punitive damages, attorney's fees, with interest and costs.

### COUNT VII
### <u>ASSAULT AGAINST WALTER LEWIN</u>

127. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 111 of this Complaint as if more fully set forth below.

128. "Lewin" placed "Harbi" in imminent fear of an offensive or harmful contact and thus assaulted "Harbi" without her consent, all to "Harbi's" great damage.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "Lewin", together with punitive damages, attorney's fees, with interest and costs.

## COUNT VIII
## <u>VIOLATION OF MASS. GEN. LAWS CH. 214 §1C AGAINST DEFENDANT "MIT"</u>

129.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 113 of this

Complaint as if more fully set forth below.

130.   Mass. Gen. Laws ch. 214 §1C states that "a person shall have the right to be free from

sexual harassment." Chapter 214 confers strict vicarious liability on an educational institution

for sexual harassment by a teacher. "MIT" allowed "Lewin" to engage in a quid pro quo

relationship with "Harbi", creating a hostile educational environment constituting sexual

harassment.

131.   "Lewin's" conduct towards "Harbi" constituted sexual harassment under "MIT's"

policies and procedures and "MIT" is strictly vicariously liable for "Lewin's" sexual

harassment of "Harbi".

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "MIT", together with

punitive damages, attorney's fees, with interest and costs.

## COUNT IX
## <u>BREACH OF CONTRACT AGAINST MIT AND LEWIN</u>

132.   To establish a breach of contract claim, a plaintiff must demonstrate a valid and binding

contract existed, the defendant breached that contract and the plaintiff suffered damages as a

result. Student-college relationships are contractual in nature and the terms of the contractual

relationship can be derived from student policy manuals. Under Massachusetts law, courts

apply a reasonable expectation standard when interpreting contracts between students and

their universities. The reasonable expectation standard asks what meaning the party making

the manifestation under the contract, the university, should reasonably expect the other party,

the student, to give it. See <u>Doe</u> v. <u>Trustees of Boston College</u> 2016 WL 5799297

133.    All contracts also include an implied covenant of good faith and fair dealing. This

covenant requires that neither party may do anything that will have the effect of destroying or

injuring the right of the other party to the fruits of the contract. Under this theory as alleged

by the Plaintiff, "MIT" had a contractual obligation to provide "Harbi" with an educational

environment free from sexual harassment by her professor. This contractual obligation was

specifically contained within the policy and procedure manuals of "MIT" governing the

conduct of professors and teachers dealing with "MIT" students. According to "MIT's"

report, "Lewin" violated the policies against sexual harassment of students which he was

contractually obligated to abide by when engaged in sexual harassment of "Harbi". As a

consequence of that breach, "Harbi" sustained significant injury including the loss of an

educational opportunity and obtaining a certificate of mastery in physics from "MIT".

Additionally, despite a breach of the contract by "MIT" and "Lewin", neither party did

anything to attempt to mitigate or remedy the damages "Harbi" sustained as a result of the

breach of contract.

134.    "Harbi" and "MIT" and "Lewin" entered into a contract whereby MIT and Lewin agreed

to provide "Harbi" with an educational environment free from sexual harassment. The

contract also provided that if "Harbi" completed the course requirements successfully, she

would receive a certificate of mastery in physics from "MIT".

135.    "MIT" and "Lewin" engaged in a pattern of sexual harassment which prevented "Harbi"

from obtaining her certificate of mastery thereby breaching the contract and causing "Harbi"

to sustain a loss of her educational opportunity. Additionally, neither "MIT" nor "Lewin" did

anything to mitigate "Harbi's" damages or to provide any remedial measures to enable her to

obtain her certificate of mastery.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, "MIT", with interest

and costs.

<div style="margin-left:50%">

Respectfully Submitted,
The Plaintiff,
By His Attorney,

*/s/ David P. Angueira*
David P. Angueira, BBO #019610
Swartz & Swartz, P.C.
10 Marshall Street
Boston, MA 02108
Tel: (617) 742-1900
Fax: (617) 367-7193
dangueira@swartzlaw.com

</div>

<div style="text-align:center">

**CERTIFICATE OF SERVICE**

</div>

I, David P. Angueira, Esq., hereby certify that this document filed through the ECF system will
be sent electronically to the registered participants as identified on the Notice of Electronic Filing
on this 6th day of April 2017.

<div style="margin-left:50%">

*/s/ David P. Angueira*
David P. Angueira, Esq.

</div>