UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FAÏZA HARBI | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION NO. 1:16-cv-12394-FDS |
| | * | |
| MASSACHUSETTS INSTITUTE OF | * | |
| TECHNOLOGY, and WALTER LEWIN | * | |
| | * | |
| Defendants. | * | |

## PLAINTIFF, FAIZA HARBI'S, OPPOSITION TO DEFENDANT, MASSACHUSETTS INSTITUTE OF TECHNOLOGY'S MOTION TO DISMISS

NOW COMES the Plaintiff, Faiza Harbi, ("Ms. Harbi") and opposes Defendant Massachusetts Institute of Technology's ("Defendant") Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Ms. Harbi contends that her amended complaint does in fact allege sufficient facts to state a cause of action against the Defendant. Therefore, this Court should deny the Defendant's motion to dismiss.

## I.    FACTUAL BACKGROUND

In August 2013, Ms. Harbi enrolled in the EDX 'For The Love Of Physics' course (8.01X) taught by Mr. Lewin and promulgated and/or sponsored by "MIT". The class began in September, 2013. *Am. Compl.* ¶ 6. Ms. Harbi decided to take the course due to her love of learning and to also obtain a Certificate of Mastery from "MIT" and Professor Lewin due to his association with "MIT" and his perceived reputation. *Am. Compl.* ¶ 13.

Many EDX courses had a Facebook page where students can assist each other with assignments. *Am. Compl.* ¶ 14. Because 'For The Love of Physics' did not have a page, Ms. Harbi created one. *Id.* This was a closed group and students had to apply to join. *Id.* Ms. Harbi and the other administrators could either accept or decline the request as well as ban users from the group.

*Id*.  On November 24, 2013, Mr. Lewin requested to join the Facebook group.  *Am. Compl.* ¶ 15.

Thereafter, Ms. Harbi disclosed to Mr. Lewin that her concentration in class may be affected by her medication, to which Mr. Lewin inappropriately responded with "what medication do you take and why?"  *Am. Compl.* ¶ 16.  In another email shortly thereafter, Mr. Lewin asked "what happened that caused your depression, to which Ms. Harbi responded by detailing her history of being the victim of an abusive upbringing.  *Am. Compl.* ¶ 17.  Mr. Lewin responded to Ms. Harbi's detailed description of her past abuses with sexually explicit terminology, which was just the beginning of numerous inappropriate emails and messages between him and Ms. Harbi.  *Am. Compl.* ¶ 18.

Approximately three weeks after this initial contact, Ms. Harbi received a friend request from Mr. Lewin on Facebook.  *Am. Compl.* ¶ 19.  Ms. Harbi" and Mr. Lewin then began communicating by private messenger and eventually began messaging on Skype as well.[1]  *Id*.  Upon becoming Facebook friends with Ms. Harbi, Mr. Lewin explicitly suggested to Ms. Harbi that becoming friends will help her to regain self-confidence and also implied success in his classes suggesting a quid pro quo relationship for success in his class.  *Am. Compl.* ¶ 20.

In early December 2013, the conversations between Ms. Harbi and Mr. Lewin turned even more explicit, with Mr. Lewin disclosing to her that he "wanted her body in a sexual way." *Am. Compl.,* ¶ 21.  Ms. Harbi then explicitly stated to Mr. Lewin that she does not feel the same way about him.  *Id*.  Mr. Lewin continued to improperly influence and sexually harass Ms. Harbi online throughout her time as a student in the "MIT" EDX course, again implying that her success with the class could be affected by her relationship with Mr. Lewin.  *Am. Compl.,* ¶ 22.  Throughout the subsequent months, "Harbi" did not break contact with Mr. Lewin for fear of being removed from

---

[1]Many of the Skype communications contain video images which are referred to in the Plaintiff's Amended Complaint, but would need to be examined by the court to appreciate Lewin's outrageous conduct and demeanor.

the EDX course.  *Am. Compl.,* ¶ 23.   This fear stemmed in part from her past abuse.  *Id.*  In an attempt to end Mr. Lewin's persistent requests and continue with her education, Ms. Harbi sent him revealing photographs.  *Id.*  At all relevant times Ms. Harbi believed that Mr. Lewin was acting as an "MIT" professor and her completed class performance could be documented on a professional resume as an "MIT" affiliated course.  *Id.*

Ms. Harbi and Mr. Lewin also communicated via Skype video sessions during which Mr. Lewin performed sexually explicit acts including exposing his genitalia and masturbating.  *Am. Compl.,* ¶ 24.  Additionally, Mr. Lewin sent Ms. Harbi nude photographs on multiple occasions, some of which were sent through his "MIT" email furthering confirming his association with "MIT".  *Id.*   Mr. Lewin used his "MIT" email to send not only explicit images, but highly inappropriate written messages that, at all times relevant, were sent through the "MIT" email server.  *Am. Compl.,* ¶ 25. In August 2014, upon realizing that the online sexual activity instigated by Mr. Lewin was highly inappropriate, Ms. Harbi began to self-mutilate and was hospitalized.  *Am. Compl.,* ¶ 26.   Mr. Lewin's online manipulation and sexual harassment seriously and profoundly exacerbated Ms. Harbi's symptoms.  *Am. Compl.,* ¶ 28.  Mr. Lewin improperly used his association with "MIT" and his position to induce Ms. Harbi to engage in an inappropriate relationship with his student in exchange for her perceived belief that her academic performance was dependent on Mr. Lewin. *Id.*

On October 7, 2014, Ms. Harbi reported Mr. Lewin's conduct to "MIT" and also began seeing a survival counselor.  *Am. Compl.,* ¶ 30.  "MIT" conducted an investigation and on December 2, 2014, informed Ms. Harbi of the results. *Am. Compl.,* ¶ 31.  "MIT" ultimately found that Mr. Lewin's conduct "violated "MIT's" Policies and Procedures, including Sections 9.5 Policy on Harassment, 4.4 Conflict of Interest, 9.1 Personal Conduct and Responsibilities Towards

Students and Employees, and 9.7 Relations with Students and Student Conduct." *Am. Compl.,* ¶ 32 (See MIT's Investigation report attached as Exhibit A of Plaintiff's First Amended Complaint). The investigation also brought to light that this was not the first instance of sexual harassment perpetrated by Mr. Lewin. *Am. Compl.,* ¶ 37.

In response to Ms. Harbi's complaints, "MIT" simply severed ties with Mr. Lewin and prohibited him from accessing "MIT" resources. *Am. Compl.,* ¶ 35. Nothing else was done by "MIT" to assist Ms. Harbi with the harm Mr. Lewin and "MIT" had caused her. *Id.* "MIT" did not offer or initiate any type of counseling for Ms. Harbi or additional training sessions for their instructors, employees, staff or students to educate them on sexual abuse on campus and in online course work. *Am. Compl.,* ¶ 36.

## II.   STANDARD OF REVIEW

In order to survive a motion to dismiss, the complaint must contain sufficient facts which, if accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although evaluating the plausibility of a legal claim "requires the reviewing court to draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, the court may not disregard properly pled factual allegations even if "it strikes a savvy judge that actual proof of those facts is improbable." *Twombly,* 550 U.S. at 556. Nor may a court attempt to forecast a plaintiff's likelihood of success on the merits—"a well-pleaded complaint may proceed even if . . . 'a recovery is very remote and unlikely.'" Id. (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint. In other words, a motion to dismiss should *only* be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Further, courts have held that a high degree of factual specificity is not required at the pleading stage. *Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 517 (2016). Therefore, at this stage, the Ms. Harbi's complaint, together with the referenced documents, satisfies the pleading requirements and sets forth sufficient facts to show a plausible claim for relief.

## III.    ARGUMENT

A motion to dismiss under Rule 12(b)(6) is disfavored and rarely granted. *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986) ("It is axiomatic that '[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'") (Quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure 1357, at 598.) The issue is not whether Ms. Harbi will prevail or not. The issue is whether Ms. Harbi is entitled to discovery and offer evidence in support of her claims. Ms. Harbi submits she is so entitled. Further, because this case is at the pleading stage, this court only need to decide if there is a plausible inference that arises from the factual allegations. *Doe 20 v. Board of Educ. of Community Unit School Dist. No. 5*, 680 F.Supp.2d 957 (C.D. Illinois 2010). Therefore, Ms. Harbi's amended complaint should not be dismissed for the following reasons: Ms. Harbi has sufficiently pled statutory standing under Title IX; Ms. Harbi has sufficiently pled that the Defendant acted with deliberate indifference in violation of Title IX and M.G.L.c. 214 §1C; Ms. Harbi has sufficiently pled that the Defendant owed her a duty of care and in breach of that duty it resulted in Ms. Harbi suffering damages; and lastly, Ms. Harbi has sufficiently pled facts to establish that a valid, binding contract existed between herself and the Defendant.

**A. Ms. Harbi's Title IX Claim Should Not Be Dismissed as Ms. Harbi Does Not Lack Statutory Standing.**

When a plaintiff alleges injury to rights conferred by a statute, there are two separate standing-related inquiries that are pertinent: whether the plaintiff has Article III standing (constitutional standing) and whether the state gives that plaintiff authority to sue (statutory standing). *Katz v. Pershing, LLC,* 672 F.3d 64, 75 (1st Cir. 2012). Statutory standing specifically asks the question of whether the statute gives the plaintiff authority to sue. *Merriam v. Demoulas*, 2013 U.S. Dist. LEXIS 77600, at *13 (D. Mass. June 3, 2013).  In determining if a statute gives a plaintiff such authority, the court should look to the language of the statute, its legislative history, and administrative interpretations. *Phillips v. St. George's Univ.,* 2007 U.S. Dist. LEXIS 84674, at * 11 (E.D.N.Y. Nov. 15, 2007).

The Defendant has claimed that Ms. Harbi has no statutory standing because she has failed to have contact with Mr. Lewin within the United States nor has she ever been to the United States, relying on a small portion of Title IX's language alluding that a plaintiff must have had physical contact with in the United States. This assertion is without merit. What the Defendant fails to address is the remaining language in Title IX that specifies *any* program or *any* activity receiving federal financial assistance. 20 U.S.C. § 1681.  This includes the MIT MOOC program officially attached or connected with the Defendant who receives federal financial assistance.

Further, the court in *King v. Bd. Of Control*, specifically held that the Title IX language is to be construed broadly in scope as to encompass *every single* university education program. 221 F.Supp.2d 783, 788 (E.D. Mich. 2002); see also *Jackson v. Birmingham Bd. Of Edu,* 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005)("…Title IX,…, broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex'). In *King*, a judge in the Eastern District of Michigan considered Eastern Michigan University students' claims that they were

sexually harassed by fellow students, including a student paid as an advisor, in a five-week, university-run, study abroad program in South Africa. 221 F. Supp. 2d 783 (E.D. Mich. 2002). The Court held that Title IX *did* apply to the university's program in South Africa because "study abroad programs are operations of the University which are explicitly covered by Title IX and which necessarily require students to leave U.S. territory in order to pursue their education." *Id*. at 788.

Under the United States Department of Education's definition of what constitutes as an 'educational program', the Defendant's MOOC course fits neatly within its scope. The term educational program means "(1) a legally authorized postsecondary program of organized instruction or study that (i) leads to an academic, professional, or vocational degree, or certificate, or other recognized educational credential…"[2] Without facts to dispute otherwise, the Defendant's MOOC program qualifies as such. Like the study abroad program in *King*, the MIT MOOC is an operation of the Defendant and therefore explicitly covered by Title IX. Further, the Defendant has publically, voluntarily, knowingly, and intentionally promoted this course as a mimic of what the Defendant's on-campus students' encounter during an introductory physics course, including receiving similar assessments that the Defendant's students receive.[3] Therefore, to suggest that Ms. Harbi never participated in a U.S. based education program merely because she was not physically seated on the Defendant's physical campus is illogical. Also, similar to the students in *King* who participated in study abroad programs that mimicked university programs offered in the U.S., the materials provided to Ms. Harbi mimicked the materials the Defendant's first-year

---

[2] 34 CFR 600.2 [Title 34 – Education; Subtitle B -- Regulations of the Offices of the Department of Education; Chapter VI -- Office of Postsecondary Education, Department of Education; Part 600 -- Institutional Eligibility under the Higher Education Act of 1965, as Amended; Subpart A – General],
[3] Defendant publically published an article on January 23, 2013 on their Open Courseware website marketing the MOOC as a mimic of a first year student's physics course, complete with offering similar assessments based on what students experience at MIT. https://ocw.mit.edu/about/media-coverage/press-releases/lewin-mooc-announced/

students received taking an introductory physics course at the Defendant's physical campus in the U.S. and was instructed by a prominent MIT professor, Mr. Lewin. At the very least these facts *demonstrate*, not distinguish, that Ms. Harbi is similarly situated to the students in the *King* case and deserves Title IX protections.

Moreover, the Defendant's own policies provide further support for Ms. Harbi's claim that Title IX protections not only apply to conduct that occurs on the Defendant's physical campus, but also extends to students who participate in the Defendant's online courses. *See* Am. Compl. Ex. A. at 8. The Defendant's own investigatory report cites and explicitly states that Ms. Harbi, as a student in a virtual course offered through the Defendant's online educational platform, deserved the same respectful treatment and common decencies that are encouraged and fostered by the Defendant's policies for members of the Defendant's community and students who attend classes on campus. *Id.* Therefore, Ms. Harbi is entitled to the same protections whether she sat physically at a desk in one of the Defendant's classrooms or she sat in a chair at her laptop directly in the Defendant's online classrooms.[4]

Lastly, the Defendant erroneously relies on *Phillips v. St. George's Univ.,* in which a judge in the Eastern District of New York held that because the student-to-student sexual harassment occurred in a foreign territory coupled with Title IX's use of 'person in the United States' that the plaintiff was barred from bringing Title IX claims holding that the statute was only applicable domestically. The crux of this argument is centered on the fact that the conduct happened *exclusively* in a foreign territory and that the defendant had *no* ties to the United States. 2007 U.S. Dist. LEXIS 84674, at *5. The present circumstances are distinguishable from *Phillips* for two

---

[4] The same analogy can be made if a student was sitting in her dorm room engaging in an interactive online course with her professor who was harassing her.

reasons: (1) the teacher-to-student sexual harassment did not *exclusively* occur in a foreign territory and (2) the Defendant has ties to the United States in numerous ways.

First, unlike *Phillips* where the sexual harassment of the plaintiff was confined to a mail room on the defendant's Grenada[5] campus, the sexual harassing behavior by Mr. Lewin towards Ms. Harbi was initiated by the Defendant and Mr. Lewin in the United States. Because this behavior occurred, in part, through MIT's email server, the inappropriate conversations and interactions at the heart of this case were constructed and perpetuated *first* in the United States by way of the Defendant's email server. The Defendant undoubtedly house its MIT email servers and data processing centers at their physical location in Massachusetts.[6] This inference in itself demands further discovery into the Defendant's monitoring and retention policies regarding its electronic data and the locations of its data processing centers and servers. For as the facts suggest, the ability of the Defendant to deflect liability under Title IX by quite literally hiding behind a screen, is radically inconsistent with Congress's intent behind Title IX's construction and should not be permissible.

Given the *King* interpretation of Title IX including every single educational program, the qualifying nature of the Defendant's MOOC through a platform that's based in the United States, the Defendant owned data processing centers and email servers containing the harassing communications, and the Defendant's own policies plainly constructing a reasonable expectation that every student should expect to be treated in compliance with the same standards as those students enrolled in on-campus classes are, Ms. Harbi has pled sufficient facts to show her standing

---

[5] Grenada is an island country in the southeastern Caribbean Sea.
[6] This gives rise to a plausible inference that the Defendant not only had readily available access to the email content, but that the teacher-on-student sexual harassment was perpetuated and continued through use of Defendant owned property permanently located in the United States for the duration of the harassment. Therefore, unless the Defendant were to disclaim its own email servers and its content, the harassment occurred *in* the United States and thereby qualifies for statutory standing under the language of Title IX.

under Title IX. The Defendant should, accordingly, be estopped from asserting otherwise. *Suzuki v. Abiomed, Inc.*, 2017 WL 2230331 (D. Mass. 2017).  Secondly, unlike the *Phillips* where the court held that since the plaintiff was harassed in a foreign territory at a foreign university by an employee of such university Title IX was inapplicable, here Ms. Harbi's harassment occurred in the United States by the Defendant, a United States university, by one of its employees and/or agents. Thus, because Ms. Harbi's harassment did not *exclusively* occur in a foreign territory and the Defendant has numerous ties to the United States, the *Phillips* case, relied on by the Defendant is wholly distinguishable. Finally, the Defendant voluntarily and knowingly assumed all duties and responsibilities associated with such conduct when they disseminated and made equally applicable such policies to both on-campus and online students, despite their geographical location.

### B. Ms. Harbi's Title IX Claim Should Not Be Dismissed As Ms. Harbi Has Alleged Sufficient Facts That Defendant Knew Or Should Have Known About Mr. Lewin's Conduct And That Defendant Acted With Deliberate Indifference.

In order to establish a claim under Title IX, Ms. Harbi must allege facts sufficient to prove that (1) she was subjected to harassment severe enough to compromise her educational opportunities; (2) that the educational institution has knowledge of the harassment; and (3) that the institution exhibited deliberate indifference to the harassment. *Wills v. Brown Univ.,* 184 F.3d 20, 26 (1st Cir. 1999); Education Amendments of 1972, §901(a), 20 U.S.C.A. §1681(a). In regards to the knowledge that educational institutions must have, most courts have stated that the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse. *Doe v. Derby*, 451 F.Supp.2d 438, 446 (D. Conn. 2006). In order to satisfy the deliberate indifference standard, a plaintiff must plead facts sufficient to support a finding that a school acted in violation of Title IX requirements through grossly

inadequate action or no action at all, resulting in sex discrimination against the student. *Hunter v. Barnstable Sch. Comm.,* 456 F.Supp.2d 255, 265 (2006). Accordingly, whether a school responds "reasonably, or with indifference" is dependent upon the specific circumstances known to the school at the time and is a matter of fact best left to a jury. *Doe v. Town of Hopkinton,* 2017 Mass. Super. LEXIS 23.

       i.   <u>Ms. Harbi has alleged sufficient facts that Mr. Lewin's conduct was severe enough to interfere and/or compromise her educational opportunity in the MIT MOOC course.</u>

A plaintiff must establish that the sexual harassment is so severe, pervasive, and objectively offensive, that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities. *Davis v. Monroe County Bd. Of Educ.,* 526 U.S. 629, 651 (1999). A plaintiff is not required to prove that he or she was a victim of a previous sexual assault in order to prevail in a Title IX case. *Noble v. Branch Intermediate Sch. Dis.,* 2002 U.S. Dist. LEXIS 19600 (W.D. Mich. 2002). However, the conduct must be so severe, pervasive and offensive as to put a school district on notice of a substantial danger of harassment. *Id.*

In the case at bar, Mr. Lewin engaged in sending sexually explicit commentary towards Ms. Harbi regarding her past sexual abuse, her current sexual state, and included exposing his genitalia to her on multiple occasions in an unwelcomed manner.[7] For the duration of this conduct, Mr. Lewin alluded to Ms. Harbi that her success in the MIT MOOC course would be dependent on the her relationship with Mr. Lewin. In fear of being removed from the course, Ms. Harbi complied with the unwelcomed, inappropriate conduct by Mr. Lewin. Thus, Mr. Lewin's sexually explicit communications and inappropriate harassing conduct towards Ms. Harbi cost her the

---

[7] See Am. Compl. ¶21 - ¶25.

ability to competently participate in the MIT MOOC course for fear of displeasing Mr. Lewin and thus affecting her completion of the certificate. Further, this conduct coupled with Ms. Harbi's vulnerable mental state led her to engage in self-mutilation that resulted in hospitalization.[8] Ms. Harbi submits that such facts are sufficient to create an inference that Mr. Lewin's conduct was objectively and patently severe, pervasive and offensive to the point where it deprived her of her educational opportunity and did in fact do so.

    ii.  <u>Ms. Harbi has alleged sufficient facts that the Defendant knew or should have known about Mr. Lewin's sexual harassing conduct towards her.</u>

The Defendant has submitted that Ms. Harbi's claim under Title IX should be dismissed due to Ms. Harbi's failure to allege that the Defendant had any knowledge of Mr. Lewin's alleged misconduct towards her prior to October 7, 2014. Ms. Harbi submits that this claim is erroneous due to the ample evidence contained on the Defendant's own email server of the inappropriate interactions between Ms. Harbi and Mr. Lewin. The Defendant's specific allegation that Ms. Harbi's conclusory allegation that it knew or should have known about the conduct is in direct conflict with this evidence. *See* Defendant's Mot. Dismiss at 6-8.  Moreover, due to the virtual nature of the education program the Defendant had a duty to monitor Mr. Lewin's MIT email account to ensure Ms. Harbi's right to freedom from sexual harassment under M.G.L.c. 214, §1C was being protected. *Doe v. Bradshaw*, 2016 U.S. LEXIS 114748 at *45 (D. Mass. 2016).

Further, the Defendant possessed the ability, authority, and opportunity to monitor Mr. Lewin's MIT emails. Once the information being exchanged between Mr. Lewin and Ms. Harbi began to contain "highly personal and intimate information" any reasonable expectation of privacy Mr. Lewin had was lost. *Falmouth Fire Fighters' Union Local 1497 v. Town of Falmouth*, 2011 Mass. Super LEXIS 362, at *8.  Given that the Defendant should have known, through routine

---

[8] See Am. Compl. ¶26.

intuitional monitoring of its employee's email accounts, it necessarily follows that the Defendant should have known that its professor, Mr. Lewin, was engaged in inappropriate communications with Ms. Harbi prior to her official complaint on October 7, 2014.

The Defendant also erroneously claims that Ms. Harbi's Title IX claim should be dismissed due to Ms. Harbi's failure to sufficiently allege that the Defendant had prior notice of the sexual harassment allegedly perpetuated by Mr. Lewin against others. Ms. Harbi submits that the Defendant's willful blindness to Mr. Lewin's own statements regarding his repeated inappropriate behavior with women is indefensible. The Defendant's investigatory report refers explicitly to Mr. Lewin's admissions that he has engaged in prior inappropriate sexual behavior with women.[9] *See* Am. Compl. Ex. A at 11. The Defendant's report states that Mr. Lewin stated, "I had done that before through Facebook. I taught another woman how to masturbate, and she learned she could do it." Mr. Lewin further acknowledged that he has sent sexually explicit pictures to someone else (Woman A) "probably this year-very recently." Mr. Lewin also stated that he sent "a different picture at a different time" to another woman (Woman B), and also exchanged pornographic images 'back and forth" with her on Facebook. In response to this disclosure, the extent of the Defendant's inquiry is outrageous and deliberately indifferent. Mr. Lewin was merely asked if the women were of age, not if the women were a part of the Defendant's student community nor if they were employed by the Defendant or otherwise associated.

This lack of inquiry showcases the intentional and/or deliberate indifference on behalf of the Defendant towards prior sexual harassing conduct by Mr. Lewin. In addition, Mr. Lewin's own statements suggest that had Ms. Harbi been a student in his classroom his behavior would not have

---

[9] This report fails to mention any indication that this was the Defendant's first time learning of Mr. Lewin's inappropriate conduct. This leads to a reasonable inference that the Defendant in fact had prior knowledge of Mr. Lewin's past indiscretions and continued to employ, if not associate with him, despite such knowledge.

altered. These circumstances necessitate further inquiry by the Defendant which was not conducted and discovery to determine if the Defendant had already known about these communications with the prior victims and if so, did the Defendant also know that these victims were associated with, employees of, or students of the Defendant, either online or on-campus. Therefore, given the absence of such an inquiry by the Defendant and the need for discovery on the extent of knowledge that the Defendant had of Mr. Lewin's sexually harassing communications with the prior women, Ms. Harbi's Title IX claim should not be dismissed due to lack of knowledge. Moreover, this court need only decide if a plausible inference of actual knowledge arises from the factual allegation. *Doe 20 v. Board of Educ. of Community Unit School Dist. No.,* 680 F.Supp.2d 957 (2010)("knowledge, and other conditions of mind may be alleged generally"). Ms. Harbi submits such inference is more than plausible given the circumstances and the Defendant's silence on the issue.[10]

Alternatively, in consideration of the scope of the actual knowledge requirement in Title IX cases, some courts have concluded that actual knowledge can manifest through knowledge of the high degree of risk an alleged harasser's conduct would impose upon an individual in similar circumstances. *Bloomer v. Becker College*, 2010 U.S. Dist. LEXIS 82997, at *13 (D. Mass. Aug. 13, 2010). In other words, the notice standard does not require that the offending instructor actually commit previous harassing acts against a student. *Id.* The existence of repeated misconduct by the offending instructor in violation of Title IX is sufficient to hold the Defendant liable. Therefore, the actual notice standard is satisfied when the Defendant had actual knowledge that a substantial

---

[10] The Defendant had an obligation under Title IX to conduct a thorough and complete investigation of Ms. Harbi's complaint. It blatantly appears that despite Mr. Lewin's admitted instances of peer sexual harassment and his admissions that he would act the same way with students in a physical classroom, the Defendant had an obligation to investigate Ms. Harbi's allegation and it did not do so. This is direct evidence of the Defendant's deliberate indifference to Title IX violations by sticking its head in the sand and intentionally ignoring outrageous conduct by one of its professors. *Doe v. Bradshaw,* 203 F.Supp.3d 168 (D. Mass. 2016).

risk of sexual harassing conduct by Mr. Lewin existed through the complaints of prior women. *Bloomer*, 2010 U.S. Dist. LEXIS 82997, at *14. The Defendant's investigatory report fails to address such knowledge of prior complaints including whether the prior victims were at all associated with, employed by, or students of the Defendant, making these omissions highly suspect. If the Court is to believe that the Defendant performed a thorough investigation as mandated by Title IX as it suggests, then such findings should have been methodically investigated and reported in the same document. Here, such discoveries are glaringly absent.

       iii.  <u>Ms. Harbi has alleged sufficient facts that the Defendant exhibited indifference towards the harassment.</u>

The Defendant's assertion that Ms. Harbi failed to allege sufficient facts to show that it acted with deliberate indifference is without merit. The Defendant attempts to support this allegation by stating that its response was reasonable in light of the circumstances. However, a school district could become deliberately indifferent if it has knowledge that its remedial action is inadequate and ineffective and does not take reasonable steps to eliminate the misconduct. *M.Q. v. Phenix City Bd. Of Educ.*, 2013 U.S. Dist. LEXIS 109436 (M.D. Ala. Aug. 5, 2013). In addition to needing discovery to discover and infer if the Defendant had actual knowledge of the prior sexual harassments by Mr. Lewin, discovery is needed to infer whether the Defendant took no further action in light of such knowledge, therefore failing to take reasonable steps needed to eliminate the misconduct. In light of this need, the expectation on the part of the teacher that a student will submit to unwelcome sexual advances in exchange for favorable treatment during an education program may be either explicit or implicit. *Bloomer*, 2010 U.S. Dist. LEXIS 82997, at *16.

In the case at bar, Ms. Harbi has alleged sufficient facts that demonstrate her submission to Mr. Lewin's unwelcomed sexual advances were directly tied to her success in the MIT MOOC

course. Moreover, Mr. Lewin confirmed such allegations when he alluded to Ms. Harbi that he could, if necessary, guarantee her certificate, via their special relationship.[11] At this stage of the proceeding, a reasonable inference may be made that Ms. Harbi tolerated the sexual harassment by Mr. Lewin in order to receive the full benefits of her educational opportunity through the Defendant's online course program. This situation also mirrors quid pro quo harassment and a hostile educational environment under Title IX. *Bloomer,* 2010 U.S. Dist. LEXIS 82997, at *17; *Gregory v. Daly*, 243 F.3d 687, 693 (2d Cir. 2001)(to determine whether an environment is hostile or abusive, courts must look at the "totality of the circumstances rather [than] individual events in isolation").

Alternatively, the Tenth Circuit has held that a "funding recipient can be said to have intentionally acted in clear violation of Title IX…when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007). In *Simpson*, the court held the university responsible under Title IX because an official university policy failed to properly supervise the recruiting efforts of their football team. *Id.* In other words, the Tenth Circuit allowed the pre-assault deliberate indifference claim to stand, on the grounds that the maintenance and support of the recruiting program, without proper supervision or training, constituted an "official policy" of the university. *Id.* Importantly, the court in *Simpson* stressed the fact that the university maintained this program *despite* an actual knowledge of a significantly heightened risk of sexual assault. *Id.* Thus, the Tenth Circuit's decision stands that a university may be held in

---

[11] In the Defendant's investigatory report, Mr. Lewin states, "Of course you will get the certificate you are doing well. If needed I could make it happen…I will follow your process closely."

violation of Title IX, through a policy of deliberate indifference, if it had actual knowledge of a heightened risk that is specific enough to allow it to remedy such a policy. *Id.* at 1184.

Here, the Defendant's knowledge of the substantially high risk of sexual assault on its campus, yet providing no remedial or preventative measures nor training seminars to its employees (including professors of online courses) on the known issue is analogous to the *Simpson* defendant university who despite knowing of the serious risk of sexual assault and assault during its football recruiting efforts, failed to supervise its player-host program. The Defendant had actual knowledge of a heightened risk due to their duty to report campus crime statistics annually under the Clery Act. Specifically, according to the Defendant's 2016 Clery Report, it reported that between 2013 and 2014, there were 33 instances of rape and 16 instances of fondling. The failure of the Defendant to take appropriate measures to redress the alarming statistics provides further support, in line with the Tenth Circuit's reasoning, that the Defendant acted with deliberate indifference towards Ms. Harbi through its "official policy" of turning a blind eye to the known and documented issue of sexual assault amongst its students and on its campus.

The Defendant has also erroneously relied on case law not analogous to the case at bar in regards to the adequacy of its response to Ms. Harbi's complaint. The Defendant specifically refers to *Fitzgerald v. Barnstable Sch. Comm.,* 504 F.3d 165, 174 (1st Cir. 2007), where this court found that the defendant school did not act with deliberate indifference when they learned that a student was harassed on a school bus due to their full-scale, thorough investigation of the matter and satisfactory remedial measures provided (emphasis added). The Defendant contends that like the *Fitzgerald* defendant, it too, was methodical in its inquiries of Ms. Harbi's complaint. This assertion is in complete disregard of the Defendant's investigatory report's gaping holes. Further, the Defendant did not provide any remedial remedy *directly to* Ms. Harbi. In *Fitzgerald, the*

defendant school offered to change the plaintiff student's bus assignment, whereas here, the Defendant merely severed relationship ties with Mr. Lewin and left Ms. Harbi to recover without assistance. Ms. Harbi submits that she has sufficiently pled that the Defendant, in effect, did nothing to remedy the harm inflicted on her by its agent. As a direct result of Mr. Lewin's continual unwelcomed sexual advances, Ms. Harbi became depressed and engaged in self-mutilation that led to her hospitalization. Under Title IX, a school's investigation is a mere preliminary step, it must also provide appropriate and necessary counseling. At no point, did the Defendant offer such counseling services in an attempt to alleviate some of the psychological trauma. Further, at no point subsequent to Ms. Harbi's incident did the Defendant implement nor require any preventative measures.[12]

The Defendant's reliance on *Fitzgerald* doesn't support its own arguments. The *Fitzgerald* decision highlights the necessity of an in-depth, full-scale, thorough investigation into claims of sexual harassment. The Defendant's investigatory report highlights its investigation as incompetent and incomplete in failing to address Mr. Lewin's reported incident of prior harassment with students. This incompetence is further evidenced by Mr. Lewin's troubling admissions that he had engaged in prior behavior identical to the communications with other women as he had with Ms. Harbi. The report further admonishes that the Defendant intentionally *chose* not to investigate such incidents. The lack of pursuit of prior incidents concerning Mr. Lewin is in itself sufficient grounds for a reasonable inference that the Defendant was deliberately

---

[12] The Defendant provided no additional training seminars for its current staff, instructors, or students on how to prevent or report suspected sexual harassment as recommended by guidance by the Department of Education's Office of Civil Rights (OCR). While the Defendant argues that the OCR documents are of no relevancy, it fails to acknowledge that it used the very language contained in such materials to construct its own policies in violation in the case at bar, making them wholly relevant. Separately, Ms. Harbi has filed an opposition to the Defendant's Motion to Strike addressing these allegations.

indifferent.[13] There is a reasonable inference that the Defendant may have *indeed* discovered facts regarding other inappropriate encounters by Mr. Lewin and MIT students and deliberately *chose* not to include it in the report. Courts have routinely found that an institution's failure to properly investigate a claim of discrimination can be seen as indication of deliberate indifference. *Jennings and Keller v. University of North Carolina at Chapel Hill*, F.3d 686, 694 (4th Cir. 2014). Accordingly, this Court should not grant the Defendant's motion to dismiss regarding Ms. Harbi's Title IX claim due to a lack of showing of deliberate indifference on behalf of the Defendant, because the mere happening of an investigation is insufficient to warrant such a dismissal. *Leader v. Harvard University Board of Overseers*, 2017 U.S. Dist. WL 1064160, at * 5 (D. Mass. March 17, 2017).

Finally, the Defendant failed to provide Ms. Harbi notice of her Title IX rights as an online student of MIT pursuant to Title IX notice requirements. 20 U.S.C. §1681. While the Defendant alleges it provided such information to on-campus students, it was not equally accessible to any online student, including Ms. Harbi. In addition to the notice requirements under Title IX, the Defendant's own policies require such notice to online students.[14] Further, courts have held that when a school violates its own policies, an inference can be reasonably concluded that such violation is a factor in establishing deliberate indifference for purposes of Title IX. *Moore v. Regents of the University of California*, 2016 WL 7048991, at * 2 (N.D. Cal. Dec, 5, 2016).  For these reasons, Ms. Harbi's Title IX claim should not be dismissed.

---

[13] The Defendant's deliberate indifference is further evidenced by its knowledge of its duty to report evidence of sexual misconduct under the Clery Act due to the significant amount of reported incidents concerning sexual misconduct. The Defendant's failure to take the appropriate steps to redress such incidents, including Ms. Harbi's, in light of such alarming statistics raises a reasonable inference of the Defendant's deliberate indifference of Title IX violations and sexual assault.

[14] The Defendant's policies dictate that online students deserve the same respectful treatment and common decencies that are encouraged and fostered by the Defendant's policies for all members of the Defendant's community and that are afforded to those students who attend classes on the MIT campus.

**C. Ms. Harbi's Claim for Violation of M.G.L.c. 214, §1C Should Not Be Dismissed Because Ms. Harbi Alleged Sufficient Facts That Defendant Was Strictly, Vicariously Liable for Mr. Lewin's Sexual Harassing Conduct and is Not Required to Exhaust Administrative Remedies.**

Sexual harassment in the educational context is defined by M.G.L.c. 151C, §1(e)[15] and includes both the quid pro quo and hostile environment forms of harassment. Chapter 214 merely expands the scope in which a person is protected by G.L.c. 151C and the remedies available to them, while G.L.c. 151C remains the source of substantive law. *Doe v. Bradshaw*, 203 F.Supp.3d 168, 189 (D. Mass. 2016). This statute also affords protections to students that is not otherwise available under G.L.c. 151B and c. 151C; it does not duplicate the relief provided by those statutes. *Lowery v. Klemm*, 446 Mass. 572, 578 (Mass. 2006). In regards to the applicable standard, it once remained a question of first impression in Massachusetts. However, recently, this Court held that while G.L.c. 151C was the Massachusetts equivalent to Title IX, the deliberate indifference standard is inapplicable in the *Doe v. Bradshaw* decision.

In *Doe v. Bradshaw*, this Court held that G.L.c. 151C claims are distinguishable from Title IX claims since "Title IX impose[s] quasi-contractual funding conditions rather than directly regulating behavior" like the statute does, therefore the deliberate indifference standard is inapplicable and the theory of strict vicarious liability prevails. *Bradshaw,* 203 F.Supp.3d at *9. See also *Bloomer v. Becker Coll.,* 2010 U.S. Dist. LEXIS, 82997, 2010 WL 3221969, at *7 (D. Mass. 2010)(There is no Massachusetts authority "stating that knowledge of the misconduct is a necessary element for recovery under Chapter 151C"). The strict vicarious liability standard was

---

[15] The term "sexual harassment" means any sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when: (i) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of the provision of the benefits, privileges or placement services or as a basis for the evaluation of academic achievement; or (ii) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's education by creating an intimidating, hostile, humiliating or sexually offensive educational environment.

confirmed in March of this year when this Court decided *Doe v. Town of Hopkinton* where it imposed strict vicarious liability on a school for teacher-on-student sexual harassment. 2017 Mass. Super. LEXIS 23.[16]

The Defendant has first submitted that Ms. Harbi's claim under G.L.c. 214, §1C must fail due to not filing a timely charge with the Massachusetts Commission Against Discrimination ("MCAD"). Ms. Harbi submits that G.L.c. 214, §1C does not impose an administrative exhaustion requirement for sexual harassment claims brought by students under said statute in conjunction with Judge Woodlock's decision in *Doe v. Bradshaw*, 203 F.Supp.3d 168, 189 (D. Mass. 2016). Judge Woodlock determined that G.L.c. 151C on its own only requires students who are "seeking admission as a student to any educational institution, or enrolled as a student in a vocational training institution" to first file with MCAD. *Id.* at *190. Because Ms. Harbi does not fall within either category, she does not need to first bring such claim before MCAD, and her filing with this court is proper. *Id.* Thus, her claim can move forward. *Id.*

Lastly, the Defendant has contended that granting Ms. Harbi the right to sue under G.L.c. 214 §1C would effectively trigger G.L.c. 151B's prohibition of sexual harassment which has no bearing in the present circumstance due to its employment law origins. Ms. Harbi submits that this claim is erroneous and ignores current case law. While the language in G.L.c. 151C differs from G.L.c. 151B, the Supreme Judicial Court has paralleled the rationale behind G.L.c. 151B to be applicable to G.L.c. 151C claims. In *College-Town Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination*, it noted that the "authority conferred upon a supervisor by the employer" is what makes the "supervisor particularly able to force subordinates to submit to sexual harassment." 400

---

[16] In *Doe v. Town of Hopkinton,* a plaintiff minor, through her parents, brought suit versus the defendant, alleging that during the 2009-2010 school year, a Hopkinton teacher sexually molested her, an eleven year old student. This Court held that the defendant was strictly liable under G.L.c. 151C and 214 for the sexual harassment of a student by a teacher. 2017 Mass. Super. LEXIS 23.

Mass. 156, 166, 508 N.E.2d 587 (1987). This rationale is equally pertinent to claims involving sexual harassment of a student by a teacher, in that a teacher or a school, like a supervisor, is conferred with authority over his or her students.[17] *Doe v. Town of Hopkinton*, 2017 Mass. Super. LEXIS 23; *Sch. Comm. Of Lexington v. Zagaeski,* 469 Mass. 104, 119, 12 N.E.3d 384 (2014)("A teacher who models sexually harassing behavior in front of public school students as if it is all in good fun undercuts out constitutional value of freedom from gender discrimination…Indeed students who witness a teacher engage in such conduct may come to believe that such conduct is acceptable in an academic or professional setting"). (Internal citations omitted). Therefore, the employment application of the statute does not bar such a claim nor is it irrelevant in this case and the Plaintiff's claim should not be dismissed. Thus, Ms. Harbi's violation of G.L.c. 214, §1C claim should not be dismissed because Ms. Harbi has sufficiently pled allegations, under the correct applicable standard adopted by this Court, that the Defendant is strictly vicariously liable for Mr. Lewin's actions.

### D. Ms. Harbi's Negligence Claim Should Not Be Dismissed as Ms. Harbi Has Alleged Sufficient Facts to Infer the Defendant owed a Duty to Ms. Harbi to protect her from Mr. Lewin's Sexual Harassing Conduct.

Usually, "the question of negligence is one of fact for the jury. Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury." *Beaver v. Costin*, 352 Mass. 624, 626 (1967) (quoting *Luz v. Stop & Shop, Inc. of Peabody*, 348 Mass. 198, 203-204 (1964)).  In order to prove a negligence claim a Plaintiff must show: (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or

---

[17] In an email submitted to the Defendant during the initial investigation, Mr. Lewin, using his MIT email address and dated three months subsequent to Ms. Harbi's enrollment in the MIT MOOC course, stated, "In August 2012 I was *again full time employed* by MIT to work on the 8.01x and 8.02x courses. (I had retired in 2009). I now have a large pension and *a large salary*…" Thus establishing him as a full-time faculty professor and subsequently satisfying the 151B requirement under G.L.c. 214, §1C.

legal cause; and (4) actual damage or injury. *Jorgensen v. Massachusetts Port Auth.,* 905 F.2d 515, 522 (1st Cir. 1990).  In regards to a legal duty owed by a university, courts have held that a duty exists between the university and its students. *Leader v. Harvard University Board of Overseers*, 2017 U.S. Dist. WL 1064160, at * 5 (D. Mass. March 17, 2017). More specifically, a university has a duty to prevent "reasonably foreseeable harm" to its students. *Kavanagh v. Trs. of Boston Univ.,* 440 Mass. 195, 203-04 (2003).  Although, the general rule states that "a person do[es] not owe others a duty to take action to rescue or protect them from conditions [h]e ha[s] not created." See Massachusetts Law and the Restatements (Second) of Torts. The Restatement, under certain circumstances, provides for an exception. The exception provides that duties "arising out of a special relationship between the parties creates a special responsibility" and therefore "takes the case out of the general rule." *Leader*, 2017 U.S. Dist. WL 1064160, at *5.

In claiming that the Defendant was not negligent due to having no legal duty to prevent Mr. Lewin from engaging in sexual harassment because it was not foreseeable, the Defendant chooses to fen ignorance of Mr. Lewin's own admissions. Due to this case being in the pleading stage, Ms. Harbi is not required to *prove* that Mr. Lewin's conduct was foreseeable, she merely has to allege sufficient facts for a plausible inference to be drawn that it was. Thus, based upon the Defendant's investigatory report, failure to deny any knowledge of prior incidents coupled with Mr. Lewin's own statements that he "probably this year-very recently" sent sexually explicit photographs to one woman (Woman A) and in the next breathe stating that he sent "a different picture at a different time" including pornographic photos with another (Woman B); such allegations are sufficient to lead to a plausible inference that his inappropriate conduct was foreseeable. Further, the Defendant's only inquiry into the identity of these women was if they

were over the age of 18.[18] The Defendant notably failed to inquire of Mr. Lewin or report about if these women were students or former students. In addition, Mr. Lewin went on to admit that if the *same circumstances* were to occur in a classroom setting, his actions would be the identical. Due to this blatant lack of comprehensive inquiries into Mr. Lewin and his past conduct, discovery is needed to determine if the Defendant had prior knowledge of Mr. Lewin's prior inappropriate sexual communications and if these women were MIT on-campus students or online students. If it's so, then Mr. Lewin's conduct towards Ms. Harbi was reasonably foreseeable and the Defendant owed Ms. Harbi a duty to protect her from it.

In addition, the Defendant had a statutory duty under M.G.L.c. 214, §1C to protect Ms. Harbi from Mr. Lewin's sexual harassment. In accordance with G.L.c. 214, §1C, "a person shall have the right to be free from sexual harassment." Specifically, G.L.c. 214, §1C confers strict vicarious liability on an educational institution for sexual harassment by any employee vested with authority to care for and/or supervise students. *Doe v. Bradshaw*, 2016 U.S. LEXIS 114778, at *47 (D. Mass. 2016). Therefore, it follows that the Defendant owed Ms. Harbi a legal duty to prevent its employees or agents from sexually harassing her. Strict liability by definition presumes a duty existed.

Alternatively, the Defendant owed a fiduciary duty to Ms. Harbi. A fiduciary relationship is established one of four ways: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first; (2) when one person assumes control and responsibility over another; (3) when one person has a duty to act for or give advice to another on matters that fall within the scope of the relationship; or (4) when there is a specific relationship that has been traditionally recognized as involving fiduciary duties such as a lawyer and a client

---

[18] It appears that the Defendant was only interested in child rape or abuse and ignored all evidence of sexual harassment and assault against other MIT students or staff members.

or a stockbroker and a client. *Fiduciary Relationship, Black's Law Dictionary* (7th ed. 1999). Here, a fiduciary relationship was established when Ms. Harbi placed an enormous amount of trust in the Defendant's alleged faithful integrity as a professor and prominent figure in his field of expertise, that in exchange gave the Defendant superiority and influence over Ms. Harbi.

Accordingly, some courts have held that a fiduciary duty exists between a professor and a student. *Schneider v. Plymouth State DCCC,* 144 N.H. 458, 744 A.2d 101, 105-106 (N.H. 1999). In *Schneider*, the court stated that "[i]n the context of sexual harassment by faculty members, the relationship between a post-secondary institution and its students is a fiduciary one." *Id.* at 105. The court reasoned that, "the power differential between faculty and students … makes it difficult for [students] to refuse unwelcome advances and also provides the basis for negative sanctions against those who do refuse." *Id.* When Ms. Harbi enrolled in the MIT MOOC, she depended on the Defendant for her education, thereby requiring it to "act in good faith and with due regard" for her interests. *Id.* The relationship between Ms. Harbi and the Defendant was built on a professional relationship of trust and deference, rarely seen outside of an academic atmosphere. *Id.* at 106. As a result, this relationship gives rise to a fiduciary duty on behalf of the Defendant to create an environment in which Ms. Harbi could pursue her education free from sexual harassment by faculty members *Id.*

Moreover, the Defendant's claims that it had no legal duty to prevent Mr. Lewin in engaging in misconduct that was not reasonably foreseeable ignores the Supreme Court's decision in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998). In *Gebser,* the Court articulated that the number of reported cases involving sexual harassment of students in schools confirms that harassment unfortunately is an all too common aspect of the educational experience. *Id.* While the *Gesber* court didn't explicitly equate the common place nature of sexual harassment

on a university campus with the reasonable foreseeability of its happening, there's a noted implication that it is. Said another way, given the *Gesber* court's notation coupled with the unfortunate regularity of sexual assaults and harassment incidents on university campuses (both physical and virtual), a reasonable inference may be inferred that universities, including the Defendant, have or should have foreseen the substantial risk of such conduct. Thus, Mr. Lewin's unwelcomed, inappropriate sexual communications and advances towards Ms. Harbi was within the realm of its protective duty.

This reasonable inference is further supported by the Defendant's duty to report sexual assaults as part of the crime statistics on its campus in compliance with the Clery Act and its Title IX obligations. Campus sexual assaults and harassments also have gotten a multitude of media attention as of late in addition to former President Obama's "It's on US" initiative targeting sexual assaults on college campuses. The Defendant's own 2014 survey revealed that 17% of all its female students reported experiencing sexual assault. These allegations coupled with the nationwide "Dear College" letter in 2011 issued by the Department of Education's Office of Civil Rights[19] sufficiently demonstrate that there is no plausible way that sexual assault and sexual harassment is anything *but* foreseeable behavior. Therefore, Ms. Harbi's claim should not be dismissed.

### E. Ms. Harbi's Claim for Negligent Infliction of Emotional Distress Should Not Be Dismissed as the Defendant Owed Ms. Harbi a Duty of Care.

In order to state a claim for negligent infliction of emotional distress a plaintiff must show (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case. *Conley v. Romeri*, 60 Mass. App. Ct. 799, 801 (2004). More

---

[19] In April 2011, the Department of Education, Office of Civil Rights issued a warning to all educational institutions throughout the country reminding them of their responsibilities under Title IX to protect students from sexual harassment.

specifically, there must be a showing of a duty of care owed to the plaintiff because without a duty, there is no negligence. *Id.* The issue of causation and whether a reasonable person would have experienced similar emotional distress under the circumstances are without a doubt a question for a jury. *Selfridge v. Jama*, 172 F.Supp.3d 397, 424 (2016).

Ms. Harbi submits that the Defendant's claim that she has failed to allege sufficient facts to support the existence of a duty on behalf of the defendant is without merit. As discussed above, Ms. Harbi has alleged sufficient facts to lead to a reasonable inference of not only a common law duty to protect Ms. Harbi from Mr. Lewin's foreseeable inappropriate conduct, but a statutory duty under M.G.L.c. 214, §1C. These allegations together with the Defendant's admissions that it owed Ms. Harbi a duty of care as a student affiliated with its online program provide a plethora of plausible inferences that establish a legal duty on behalf of the Defendant, therefore, Ms. Harbi's claim should not be dismissed.

### F. Ms. Harbi's Claim for Breach of Contract Should Not Be Dismissed As Ms. Harbi has Alleged Sufficient Facts that an Implied-In-Fact Contract Existed Between the Defendant and Ms. Harbi, in addition to an Implied Covenant of Good Faith and Fair Dealing, which the Defendant Breached Resulting in Damages to Ms. Harbi.

In order to bring a breach of contract claim under Massachusetts law, a plaintiff must plausibly allege (1) there was a valid contract, (2) the defendant breached its duties under the contract, and (3) the breach caused the plaintiff damages. *Doe v. Trs. of Boston Coll.,* No. 15-cv-10790, 2016 U.S. Dist. LEXIS 137777, at *28 (D. Mass. Oct. 14, 2016). Parties do not have to explicitly manifest their agreement by their written or spoken words so to form an express contract, a contract may be found to exist from the conduct and relations of the parties. *Katz v. Pershing, LLC*, 806 F.Supp.2d 452, 460 (D. Mass 2011), aff'd, 672 F.3d 64 (1st Cir. 2012)(applying Mass. law)("An implied-in-fact-contract comes into being when, notwithstanding the absence or a

written or verbal agreement, in the conduct or relations of the parties *imply* the existence of a contract"). In an implied-in-fact contract case, a court will look to the actions of the parties to determine whether those actions indicate that, in fact, they agreed on the essential terms of a contract. *Massachusetts Eye and Ear Infirmary v. GLT Phototherapeutics, Inc.,* 412 F.3d 215 (1st Cir. 2005)(applying Mass. law). Moreover, recovery under a contract implied-in-fact requires that Ms. Harbi show the Defendant conferred a benefit to Ms. Harbi to which it expected Ms. Harbi to pay for, and that Ms. Harbi should have expected, or a reasonable person should have expected, that he or she would have to pay for the benefit. *Full Spectrum Software, Inc. v. Forte Automation Systems, Inc.*, 100 F. Supp. 3d 50, 57 (D. Mass. 2015).

Here, the benefit conferred between the parties is the certificate Ms. Harbi stood to receive after completion of the MIT MOOC course. The certificate carries with it the benefits of the Defendant's reputation and education in addition to Mr. Lewin's prominent reputation amongst the academic community. There's an argument, upon registration for this course that a monetary fee will be paid in exchange for such certificate. The Defendant can dress up this process however it wishes, at the end of the day, it's analogous to a student paying a fee in order to receive a degree. Ms. Harbi had to pay an initial fee upon registration for the course in order to receive the certificate. A reasonable person would expect as such. Therefore, a plausible inference can be made that a valid, binding, *implied-in-fact* contract existed between the Defendant and Ms. Harbi. However, further discovery is warranted to fully flush out the specific details of the process through the EdX platform.[20] Since an implied-in-fact contract carries the same legal weight as an express contract, Ms. Harbi's claim should not be dismissed.

---

[20] The Defendant claimed partial ownership rights to the EdX platform, which they created in partnership with Harvard University in 2012. *See* MIT Investigatory Report p.4.

Further, in every contract an implied covenant of good faith and fair dealing which prohibits any contracting party from injuring another party's right to receive the benefits of the agreement exists. See *Restatements (Second) of Contracts* §205 (1981). Good faith performance or enforcement of a contract requires faithfulness to the agreed common purpose and protects the justified expectations of the parties. This duty prohibits "bad faith" conduct which violates community standards of decency, fairness, or reasonableness. *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933)("[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.").

The Defendant thus had a contractual obligation to provide Ms. Harbi with an educational environment free from sexual harassment by her professor, Mr. Lewin, an MIT agent. Due to Mr. Lewin presiding over the content and instruction of the course, the policies attached to classroom and instructor conducted, drafted, and disseminated by the Defendant, attached to its obligation to Ms. Harbi. Such policies contained provisions that prohibited sexual harassment against students (online or otherwise) and prohibited from Mr. Lewin from conducting himself in a sexually inappropriate manner. Ms. Harbi submits that by engaging in sexual harassment, via Mr. Lewin, the Defendant breached its covenant of good faith and fair dealing and its contract with Ms. Harbi by effectively thwarting Ms. Harbi's opportunity to obtain the certificate of mastering in physics from MIT and her educational opportunity. Therefore Ms. Harbi has alleged sufficient facts as to suggest that a plausible inferences exists that the Defendant breached its obligation, per Mr. Lewin's conduct, that resulted in significant damages to Ms. Harbi.

## IV.     CONCLUSION

For the foregoing reasons, Ms. Harbi, respectfully requests that this Court deny the Defendant's Motion to Dismiss in its entirety.

Respectfully Submitted,
The Plaintiff,
By Her Attorney,

*/s/ David P. Angueira*
David P. Angueira, BBO #019610
Swartz & Swartz, P.C.
10 Marshall Street
Boston, MA 02108
Tel: (617) 742-1900
Fax: (617) 367-7193
dangueira@swartzlaw.com

## CERTIFICATE OF SERVICE

I, David P. Angueira, Esq., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 13th day of June 2017.

*/s/ David P. Angueira*
David P. Angueira, Esq.